NIX, WARDEN OF THE IOWA STATE
PENITENTIARY *v.* WILLIAMS

No. 82–1651.   Argued January 18, 1984—Decided June 11, 1984

432

*Brent R. Appel*, Deputy Attorney General of Iowa, argued the cause for petitioner. With him on the briefs were *Thomas J. Miller*, Attorney General, and *Thomas D. McGrane*, Assistant Attorney General.

*Kathryn A. Oberly* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Lee*, *Assistant Attorney General Trott*, *Deputy Solicitor General Frey*, and *Joel M. Gershowitz*.

*Robert Bartels*, by appointment of the Court, 462 U. S. 1129, argued the cause and filed briefs for respondent.*

---

*James E. Duggan* filed a brief for the National Legal Aid and Defender Association as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the State of Illinois et al. by *Neil F. Hartigan*, Attorney General of Illinois, *Paul P. Biebel, Jr.*, First Assistant Attorney General, *Steven F. Molo*, Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Charles A. Graddick* of Alabama, *Norman C. Gorsuch* of Alaska, *Robert K. Corbin* of Arizona, *Duane Woodard* of Colorado, *Charles M. Oberly III* of Delaware, *Jim Smith* of Florida, *Michael J. Bowers* of Georgia, *Tany S. Hong* of Hawaii, *Jim Jones* of Idaho, *Linley E. Pearson* of Indiana, *Robert T. Stephan* of Kansas, *Steven L. Beshear* of Kentucky, *William J. Guste, Jr.*,

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether, at respondent Williams' second murder trial in state court, evidence pertaining to the discovery and condition of the victim's body was properly admitted on the ground that it would ultimately or inevitably have been discovered even if no violation of any constitutional or statutory provision had taken place.

## I

### A

On December 24, 1968, 10-year-old Pamela Powers disappeared from a YMCA building in Des Moines, Iowa, where she had accompanied her parents to watch an athletic contest. Shortly after she disappeared, Williams was seen leaving the YMCA carrying a large bundle wrapped in a blanket; a 14-year-old boy who had helped Williams open his car door reported that he had seen "two legs in it and they were skinny and white."

Williams' car was found the next day 160 miles east of Des Moines in Davenport, Iowa. Later several items of clothing belonging to the child, some of Williams' clothing, and an army blanket like the one used to wrap the bundle that Williams carried out of the YMCA were found at a rest stop on

of Louisiana, *James E. Tierney* of Maine, *Stephen H. Sachs* of Maryland, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *William A. Allain* of Mississippi, *Michael T. Greely* of Montana, *Paul L. Douglas* of Nebraska, *Brian McKay* of Nevada, *Gregory H. Smith* of New Hampshire, *Rufus L. Edmisten* of North Carolina, *Robert Wefald* of North Dakota, *Michael Turpen* of Oklahoma, *LeRoy S. Zimmerman* of Pennsylvania, *Hector Reichard* of Puerto Rico, *Travis Medlock* of South Carolina, *Mark V. Meierhenry* of South Dakota, *William M. Leech, Jr.*, of Tennessee, *David L. Wilkinson* of Utah, *John J. Easton* of Vermont, *Gerald L. Baliles* of Virginia, *Kenneth O. Eikenberry* of Washington, *Chauncey H. Browning* of West Virginia, *Bronson C. La Follette* of Wisconsin, and *Archie G. McClintock* of Wyoming; and for the Legal Foundation of America et al. by *David Crump, Wayne Schmidt*, and *James P. Manak*.

Interstate 80 near Grinnell, between Des Moines and Davenport. A warrant was issued for Williams' arrest.

Police surmised that Williams had left Pamela Powers or her body somewhere between Des Moines and the Grinnell rest stop where some of the young girl's clothing had been found. On December 26, the Iowa Bureau of Criminal Investigation initiated a large-scale search. Two hundred volunteers divided into teams began the search 21 miles east of Grinnell, covering an area several miles to the north and south of Interstate 80. They moved westward from Poweshiek County, in which Grinnell was located, into Jasper County. Searchers were instructed to check all roads, abandoned farm buildings, ditches, culverts, and any other place in which the body of a small child could be hidden.

Meanwhile, Williams surrendered to local police in Davenport, where he was promptly arraigned. Williams contacted a Des Moines attorney who arranged for an attorney in Davenport to meet Williams at the Davenport police station. Des Moines police informed counsel they would pick Williams up in Davenport and return him to Des Moines without questioning him. Two Des Moines detectives then drove to Davenport, took Williams into custody, and proceeded to drive him back to Des Moines.

During the return trip, one of the policemen, Detective Leaming, began a conversation with Williams, saying:

> "I want to give you something to think about while we're traveling down the road. . . . They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is . . . and if you get a snow on top of it you yourself may be unable to find it. And since we will be going right past the area [where the body is] on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. . . .

[A]fter a snow storm [we may not be] able to find it at all."

Leaming told Williams he knew the body was in the area of Mitchellville—a town they would be passing on the way to Des Moines. He concluded the conversation by saying: "I do not want you to answer me. . . . Just think about it . . . ."

Later, as the police car approached Grinnell, Williams asked Leaming whether the police had found the young girl's shoes. After Leaming replied that he was unsure, Williams directed the police to a point near a service station where he said he had left the shoes; they were not found. As they continued the drive to Des Moines, Williams asked whether the blanket had been found and then directed the officers to a rest area in Grinnell where he said he had disposed of the blanket; they did not find the blanket. At this point Leaming and his party were joined by the officers in charge of the search. As they approached Mitchellville, Williams, without any further conversation, agreed to direct the officers to the child's body.

The officers directing the search had called off the search at 3 p. m., when they left the Grinnell Police Department to join Leaming at the rest area. At that time, one search team near the Jasper County-Polk County line was only two and one-half miles from where Williams soon guided Leaming and his party to the body. The child's body was found next to a culvert in a ditch beside a gravel road in Polk County, about two miles south of Interstate 80, and essentially within the area to be searched.

B

*First Trial*

In February 1969 Williams was indicted for first-degree murder. Before trial in the Iowa court, his counsel moved to suppress evidence of the body and all related evidence including the condition of the body as shown by the autopsy. The ground for the motion was that such evidence was the "fruit"

or product of Williams' statements made during the automobile ride from Davenport to Des Moines and prompted by Leaming's statements. The motion to suppress was denied.

The jury found Williams guilty of first-degree murder; the judgment of conviction was affirmed by the Iowa Supreme Court. *State* v. *Williams*, 182 N. W. 2d 396 (1970). Williams then sought release on habeas corpus in the United States District Court for the Southern District of Iowa. That court concluded that the evidence in question had been wrongly admitted at Williams' trial, *Williams* v. *Brewer*, 375 F. Supp. 170 (1974); a divided panel of the Court of Appeals for the Eighth Circuit agreed. 509 F. 2d 227 (1974).

We granted certiorari, 423 U. S. 1031 (1975), and a divided Court affirmed, holding that Detective Leaming had obtained incriminating statements from Williams by what was viewed as interrogation in violation of his right to counsel. *Brewer* v. *Williams*, 430 U. S. 387 (1977). This Court's opinion noted, however, that although Williams' incriminating statements could not be introduced into evidence at a second trial, evidence of the body's location and condition "might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams." *Id.*, at 407, n. 12.

## C

### Second Trial

At Williams' second trial in 1977 in the Iowa court, the prosecution did not offer Williams' statements into evidence, nor did it seek to show that Williams had directed the police to the child's body. However, evidence of the condition of her body as it was found, articles and photographs of her clothing, and the results of post mortem medical and chemical tests on the body were admitted. The trial court concluded that the State had proved by a preponderance of the evidence that, if the search had not been suspended and Williams had not led the police to the victim, her body would have been

discovered *"within a short time"* in essentially the same condition as it was actually found. The trial court also ruled that if the police had not located the body, "the search would clearly have been taken up again where it left off, given the extreme circumstances of this case and the body would [have] been found *in short order."* App. 86 (emphasis added).

In finding that the body would have been discovered in essentially the same condition as it was actually found, the court noted that freezing temperatures had prevailed and tissue deterioration would have been suspended. *Id.*, at 87. The challenged evidence was admitted and the jury again found Williams guilty of first-degree murder; he was sentenced to life in prison.

On appeal, the Supreme Court of Iowa again affirmed. 285 N. W. 2d 248 (1979). That court held that there was in fact a "hypothetical independent source" exception to the exclusionary rule:

"After the defendant has shown unlawful conduct on the part of the police, the State has the burden to show by a preponderance of the evidence that (1) the police did not act in bad faith for the purpose of hastening discovery of the evidence in question, and (2) that the evidence in question would have been discovered by lawful means." *Id.*, at 260.

As to the first element, the Iowa Supreme Court, having reviewed the relevant cases, stated:

"The issue of the propriety of the police conduct in this case, as noted earlier in this opinion, has caused the closest possible division of views in every appellate court which has considered the question. In light of the legitimate disagreement among individuals well versed in the law of criminal procedure who were given the opportunity for calm deliberation, it cannot be said that the actions of the police were taken in bad faith." *Id.*, at 260–261.

The Iowa court then reviewed the evidence *de novo*[1] and concluded that the State had shown by a preponderance of the evidence that, even if Williams had not guided police to the child's body, it would inevitably have been found by lawful activity of the search party before its condition had materially changed.

In 1980 Williams renewed his attack on the state-court conviction by seeking a writ of habeas corpus in the United States District Court for the Southern District of Iowa. The District Court conducted its own independent review of the evidence and concluded, as had the state courts, that the body would inevitably have been found by the searchers in essentially the same condition it was in when Williams led police to its discovery. The District Court denied Williams' petition. 528 F. Supp. 664 (1981).

The Court of Appeals for the Eighth Circuit reversed, 700 F. 2d 1164 (1983); an equally divided court denied rehearing en banc. *Id.*, at 1175. That court assumed, without deciding, that there is an inevitable discovery exception to the exclusionary rule and that the Iowa Supreme Court correctly stated that exception to require proof that the police did not act in bad faith and that the evidence would have been discovered absent any constitutional violation. In reversing the District Court's denial of habeas relief, the Court of Appeals stated:

> "We hold that the State has not met the first require-
> ment. It is therefore unnecessary to decide whether
> the state courts' finding that the body would have been
> discovered anyway is fairly supported by the record. It
> is also unnecessary to decide whether the State must
> prove the two elements of the exception by clear and

---

[1] Iowa law provides for *de novo* appellate review of factual as well as legal determinations in cases raising constitutional challenges. See, *e. g.*, *Armento* v. *Baughman*, 290 N. W. 2d 11, 15 (Iowa 1980); *State* v. *Ege*, 274 N. W. 2d 350, 352 (Iowa 1979).

convincing evidence, as defendant argues, or by a preponderance of the evidence, as the state courts held.

"The state trial court, in denying the motion to suppress, made no finding one way or the other on the question of bad faith. Its opinion does not even mention the issue and seems to proceed on the assumption—contrary to the rule of law later laid down by the Supreme Court of Iowa—that the State needed to show only that the body would have been discovered in any event. The Iowa Supreme Court did expressly address the issue . . . and a finding by an appellate court of a state is entitled to the same presumption of correctness that attaches to trial-court findings under 28 U. S. C. § 2254(d). . . . We conclude, however, that the state Supreme Court's finding that the police did not act in bad faith is not entitled to the shield of § 2254(d) . . . ." *Id.*, at 1169–1170 (footnotes omitted).

We granted the State's petition for certiorari, 461 U. S. 956 (1983), and we reverse.

## II

### A

The Iowa Supreme Court correctly stated that the "vast majority" of all courts, both state and federal, recognize an inevitable discovery exception to the exclusionary rule.[2] We

---

[2] Every Federal Court of Appeals having jurisdiction over criminal matters, including the Eighth Circuit in a case decided after the instant case, has endorsed the inevitable discovery doctrine. See *Wayne* v. *United States*, 115 U. S. App. D. C. 234, 238, 318 F. 2d 205, 209, cert. denied, 375 U. S. 860 (1963); *United States* v. *Bienvenue*, 632 F. 2d 910, 914 (CA1 1980); *United States* v. *Fisher*, 700 F. 2d 780, 784 (CA2 1983); *Government of Virgin Islands* v. *Gereau*, 502 F. 2d 914, 927–928 (CA3 1974), cert. denied, 420 U. S. 909 (1975); *United States* v. *Seohnlein*, 423 F. 2d 1051, 1053 (CA4), cert. denied, 399 U. S. 913 (1970); *United States* v. *Brookins*, 614 F. 2d 1037, 1042, 1044 (CA5 1980); *Papp* v. *Jago*, 656 F. 2d 221, 222 (CA6 1981); *United States ex rel. Owens* v. *Twomey*, 508 F. 2d 858, 865–866 (CA7 1974); *United States* v. *Apker*, 705 F. 2d 293, 306–307 (CA8 1983);

are now urged to adopt and apply the so-called ultimate or inevitable discovery exception to the exclusionary rule.

Williams contends that evidence of the body's location and condition is "fruit of the poisonous tree," *i. e.*, the "fruit" or product of Detective Leaming's plea to help the child's parents give her "a Christian burial," which this Court had already held equated to interrogation. He contends that admitting the challenged evidence violated the Sixth Amendment whether it would have been inevitably discovered or not. Williams also contends that, if the inevitable discovery doctrine is constitutionally permissible, it must include a threshold showing of police good faith.

## B

The doctrine requiring courts to suppress evidence as the tainted "fruit" of unlawful governmental conduct had its genesis in *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385 (1920); there, the Court held that the exclusionary rule applies not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence. The holding of *Silverthorne* was carefully limited, however, for the Court emphasized that such information does not automatically become "sacred and inaccessible." *Id.*, at 392.

> "If knowledge of [such facts] is gained from an *independent source*, they may be proved like any others . . . ." *Ibid.* (emphasis added).

*Wong Sun* v. *United States*, 371 U. S. 471 (1963), extended the exclusionary rule to evidence that was the indirect product or "fruit" of unlawful police conduct, but there again the Court emphasized that evidence that has been illegally obtained need not always be suppressed, stating:

*United States* v. *Schmidt*, 573 F. 2d 1057, 1065–1066, n. 9 (CA9), cert. denied, 439 U. S. 881 (1978); *United States* v. *Romero*, 692 F. 2d 699, 704 (CA10 1982); *United States* v. *Roper*, 681 F. 2d 1354, 1358 (CA11 1982).

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for the illegal actions* of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.,* at 487–488 (emphasis added) (quoting J. Maguire, Evidence of Guilt 221 (1959)).

The Court thus pointedly negated the kind of good-faith requirement advanced by the Court of Appeals in reversing the District Court.

Although *Silverthorne* and *Wong Sun* involved violations of the Fourth Amendment, the "fruit of the poisonous tree" doctrine has not been limited to cases in which there has been a Fourth Amendment violation. The Court has applied the doctrine where the violations were of the Sixth Amendment, see *United States* v. *Wade,* 388 U. S. 218 (1967), as well as of the Fifth Amendment.[3]

The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from

---

[3] In *Murphy* v. *Waterfront Comm'n of New York Harbor,* 378 U. S. 52, 79 (1964), the Court held that "a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him." The Court added, however, that "[o]nce a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." *Id.,* at 79, n. 18; see *id.,* at 103 (WHITE, J., concurring). Application of the independent source doctrine in the Fifth Amendment context was reaffirmed in *Kastigar* v. *United States,* 406 U. S. 441, 460–461 (1972).

violations of constitutional and statutory protections. This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.

By contrast, the derivative evidence analysis ensures that the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct. The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. That doctrine, although closely related to the inevitable discovery doctrine, does not apply here; Williams' statements to Leaming indeed led police to the child's body, but that is not the whole story. The independent source doctrine teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.[4] See *Murphy* v. *Waterfront Comm'n of New York Harbor*, 378 U. S. 52, 79 (1964); *Kastigar* v. *United States*, 406 U. S. 441, 457, 458–459 (1972). When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation. There

---

[4] The ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule of *Chapman* v. *California*, 386 U. S. 18, 22 (1967). The harmless-constitutional-error rule "serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

is a functional similarity between these two doctrines in that exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place. Thus, while the independent source exception would not justify admission of evidence in this case, its rationale is wholly consistent with and justifies our adoption of the ultimate or inevitable discovery exception to the exclusionary rule.

It is clear that the cases implementing the exclusionary rule "begin with the premise that the challenged evidence is *in some sense* the product of illegal governmental activity." *United States* v. *Crews*, 445 U. S. 463, 471 (1980) (emphasis added). Of course, this does not end the inquiry. If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search— then the deterrence rationale has so little basis that the evidence should be received.[5] Anything less would reject logic, experience, and common sense.

---

[5] As to the quantum of proof, we have already established some relevant guidelines. In *United States* v. *Matlock*, 415 U. S. 164, 178, n. 14 (1974) (emphasis added), we stated that "the controlling burden of proof at suppression hearings should impose *no greater burden* than proof by a preponderance of the evidence." In *Lego* v. *Twomey*, 404 U. S. 477, 488 (1972), we observed "from our experience [that] no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence" and held that the prosecution must prove by a preponderance of the evidence that a confession sought to be used at trial was voluntary. We are unwilling to impose added burdens on the already difficult task of proving guilt in criminal cases by enlarging the barrier to placing evidence of unquestioned truth before juries.

Williams argues that the preponderance-of-the-evidence standard used by the Iowa courts is inconsistent with *United States* v. *Wade*, 388 U. S. 218 (1967). In requiring clear and convincing evidence of an independent source for an in-court identification, the Court gave *weight to the effect* an uncounseled pretrial identification has in "crystalliz[ing] the witnesses' identification of the defendant for future reference." *Id.*, at 240. The

The requirement that the prosecution must prove the absence of bad faith, imposed here by the Court of Appeals, would place courts in the position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity. Of course, that view would put the police in a *worse* position than they would have been in if no unlawful conduct had transpired. And, of equal importance, it wholly fails to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice. Nothing in this Court's prior holdings supports any such formalistic, pointless, and punitive approach.

The Court of Appeals concluded, without analysis, that if an absence-of-bad-faith requirement were not imposed, "the temptation to risk deliberate violations of the Sixth Amendment would be too great, and the deterrent effect of the Exclusionary Rule reduced too far." 700 F. 2d, at 1169, n. 5. We reject that view. A police officer who is faced with the opportunity to obtain evidence illegally will rarely, if ever, be in a position to calculate whether the evidence sought would inevitably be discovered. Cf. *United States* v. *Ceccolini*, 435 U. S. 268, 283 (1978):

> "[T]he concept of effective deterrence assumes that the police officer consciously realizes the probable consequences of a presumably impermissible course of conduct" (opinion concurring in judgment).

On the other hand, when an officer is aware that the evidence will inevitably be discovered, he will try to avoid engaging in

Court noted as well that possible unfairness at the lineup "may be the sole means of attack upon the unequivocal courtroom identification," *ibid.*, and recognized the difficulty of determining whether an in-court identification was based on independent recollection unaided by the lineup identification, *id.*, at 240–241. By contrast, inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings.

any questionable practice. In that situation, there will be little to gain from taking any dubious "shortcuts" to obtain the evidence. Significant disincentives to obtaining evidence illegally—including the possibility of departmental discipline and civil liability—also lessen the likelihood that the ultimate or inevitable discovery exception will promote police misconduct. See *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388, 397 (1971). In these circumstances, the societal costs of the exclusionary rule far outweigh any possible benefits to deterrence that a good-faith requirement might produce.

Williams contends that because he did not waive his right to the assistance of counsel, the Court may not balance competing values in deciding whether the challenged evidence was properly admitted. He argues that, unlike the exclusionary rule in the Fourth Amendment context, the essential purpose of which is to deter police misconduct, the Sixth Amendment exclusionary rule is designed to protect the right to a fair trial and the integrity of the factfinding process. Williams contends that, when those interests are at stake, the societal costs of excluding evidence obtained from responses presumed involuntary are irrelevant in determining whether such evidence should be excluded. We disagree.

Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial. The Sixth Amendment right to counsel protects against unfairness by preserving the adversary process in which the reliability of proffered evidence may be tested in cross-examination. See *United States* v. *Ash*, 413 U. S. 300, 314 (1973); *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 241 (1973). Here, however, Detective Leaming's conduct did nothing to impugn the reliability of the evidence in question—the body of the child and its condition as it was found, articles of clothing found on the body, and the autopsy. No one would seriously contend that the presence of counsel in the police car when Leaming appealed to Wil-

liams' decent human instincts would have had any bearing on the reliability of the body as evidence. Suppression, in these circumstances, would do nothing whatever to promote the integrity of the trial process, but would inflict a wholly unacceptable burden on the administration of criminal justice.

Nor would suppression ensure fairness on the theory that it tends to safeguard the adversary system of justice. To assure the fairness of trial proceedings, this Court has held that assistance of counsel must be available at pretrial confrontations where "the subsequent trial [cannot] cure a[n otherwise] one-sided confrontation between prosecuting authorities and the uncounseled defendant." *United States* v. *Ash, supra,* at 315. Fairness can be assured by placing the State and the accused in the same positions they would have been in had the impermissible conduct not taken place. However, if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings. In that situation, the State has gained no advantage at trial and the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a *worse* position than it would have occupied without any police misconduct. Williams' argument that inevitable discovery constitutes impermissible balancing of values is without merit.

More than a half century ago, Judge, later Justice, Cardozo made his seminal observation that under the exclusionary rule "[t]he criminal is to go free because the constable has blundered." *People* v. *Defore,* 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926). Prophetically, he went on to consider "how far-reaching in its effect upon society" the exclusionary rule would be when

> "[t]he pettiest peace officer would have it in his power through overzeal or indiscretion to confer immunity upon

an offender for crimes the most flagitious." *Id.*, at 23, 150 N. E., at 588.

Some day, Cardozo speculated, some court might press the exclusionary rule to the outer limits of its logic—or beyond—and suppress evidence relating to the "body of a murdered" victim because of the means by which it was found. *Id.*, at 23–24, 150 N. E., at 588. Cardozo's prophecy was fulfilled in *Killough* v. *United States*, 114 U. S. App. D. C. 305, 309, 315 F. 2d 241, 245 (1962) (en banc). But when, as here, the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible.

## C

The Court of Appeals did not find it necessary to consider whether the record fairly supported the finding that the volunteer search party would ultimately or inevitably have discovered the victim's body. However, three courts independently reviewing the evidence have found that the body of the child inevitably would have been found by the searchers. Williams challenges these findings, asserting that the record contains only the *"post hoc* rationalization" that the search efforts would have proceeded two and one-half miles into Polk County where Williams had led police to the body.

When that challenge was made at the suppression hearing preceding Williams' second trial, the prosecution offered the testimony of Agent Ruxlow of the Iowa Bureau of Criminal Investigation. Ruxlow had organized and directed some 200 volunteers who were searching for the child's body. Tr. of Hearings on Motion to Suppress in *State* v. *Williams*, No. CR 55805, p. 34 (May 31, 1977). The searchers were instructed "to check all the roads, the ditches, any culverts . . . . If they came upon any abandoned farm buildings, they were instructed to go onto the property and search those abandoned farm buildings or any other places where a

small child could be secreted." *Id.*, at 35.  Ruxlow testified that he marked off highway maps of Poweshiek and Jasper Counties in grid fashion, divided the volunteers into teams of four to six persons, and assigned each team to search specific grid areas.  *Id.*, at 34.  Ruxlow also testified that, if the search had not been suspended because of Williams' promised cooperation, it would have continued into Polk County, using the same grid system.  *Id.*, at 36, 39–40.  Although he had previously marked off into grids only the highway maps of Poweshiek and Jasper Counties, Ruxlow had obtained a map of Polk County, which he said he would have marked off in the same manner had it been necessary for the search to continue.  *Id.*, at 39.

The search had commenced at approximately 10 a. m. and moved westward through Poweshiek County into Jasper County.  At approximately 3 p. m., after Williams had volunteered to cooperate with the police, Detective Leaming, who was in the police car with Williams, sent word to Ruxlow and the other Special Agent directing the search to meet him at the Grinnell truck stop and the search was suspended at that time.  *Id.*, at 51–52.  Ruxlow also stated that he was "under the impression that there was a possibility" that Williams would lead them to the child's body at that time. *Id.*, at 61.    The search was not resumed once it was learned that Williams had led the police to the body, *id.*, at 57, which was found two and one-half miles from where the search had stopped in what would have been the easternmost grid to be searched in Polk County, *id.*, at 39.   There was testimony that it would have taken an additional three to five hours to discover the body if the search had continued, *id.*, at 41; the body was found near a culvert, one of the kinds of places the teams had been specifically directed to search.

On this record it is clear that the search parties were approaching the actual location of the body, and we are satisfied, along with three courts earlier, that the volunteer search teams would have resumed the search had Williams

not earlier led the police to the body and the body inevitably would have been found. The evidence asserted by Williams as newly discovered, *i. e.*, certain photographs of the body and deposition testimony of Agent Ruxlow made in connection with the federal habeas proceeding, does not demonstrate that the material facts were inadequately developed in the suppression hearing in state court or that Williams was denied a full, fair, and adequate opportunity to present all relevant facts at the suppression hearing.[6]

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.[7]

*It is so ordered.*

JUSTICE WHITE, concurring.

I join fully in the opinion of the Court. I write separately only to point out that many of Justice Stevens' remarks are beside the point when it is recalled that *Brewer* v. *Williams*, 430 U. S. 387 (1977), was a 5–4 decision and that four Members of the Court, including myself, were of the view that Detective Leaming had done nothing wrong at all, let alone anything unconstitutional. Three of us observed: "To anyone not lost in the intricacies of the prophylactic

---

[6] Williams had presented to the District Court newly discovered evidence consisting of "previously overlooked photographs of the body at the site of its discovery and recent deposition testimony of the investigative officer in charge of the search [Ruxlow]." 528 F. Supp., at 671, n. 6. He contends that Ruxlow's testimony was no more than "*post hoc* rationalization" and challenges Ruxlow's credibility. However, the state trial court and Federal District Court that heard Ruxlow's testimony credited it. The District Court found that the newly discovered evidence "neither adds much to nor subtracts much from the suppression hearing evidence." *Ibid.*

[7] In view of our holding that the challenged evidence was admissible under the inevitable discovery exception to the exclusionary rule, we find it unnecessary to decide whether *Stone* v. *Powell*, 428 U. S. 465 (1976), should be extended to bar federal habeas corpus review of Williams' Sixth Amendment claim, and we express no view on that issue.

rules of *Miranda* v. *Arizona,* the result in this case seems utterly senseless . . . ." *Id.,* at 438. It is thus an unjustified reflection on Detective Leaming to say that he "decide[d] to dispense with the requirements of law," *post,* this page, or that he decided "to take procedural shortcuts instead of complying with the law," *post,* at 457. He was no doubt acting as many competent police officers would have acted under similar circumstances and in light of the then-existing law. That five Justices later thought he was mistaken does not call for making him out to be a villain or for a lecture on deliberate police misconduct and its resulting costs to society.

JUSTICE STEVENS, concurring in the judgment.

This litigation is exceptional for at least three reasons. The facts are unusually tragic; it involves an unusually clear violation of constitutional rights; and it graphically illustrates the societal costs that may be incurred when police officers decide to dispense with the requirements of law. Because the Court does not adequately discuss any of these aspects of the case, I am unable to join its opinion.

I

In holding that respondent's first conviction had been unconstitutionally obtained, Justice Stewart, writing for the Court, correctly observed:

> "The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder and the victim a small child. But it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all." *Brewer* v. *Williams,* 430 U. S. 387, 406 (1977) *(Williams I).*

There can be no denying that the character of the crime may have an impact on the decisional process. As the Court

was required to hold, however, that does not permit any court to condone a violation of constitutional rights.[1] To-day's decision is no more an ad hoc response to the pressures engendered by the special facts of the case than was *Williams I*. It was the majority in *Williams I* that recognized that "evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams." *Id.*, at 407, n. 12. It was the author of today's opinion of the Court who characterized this rule of law as a "remarkable" and "unlikely theory." *Id.*, at 416–417, n. 1 (BURGER, C. J., dissenting). The rule of law that the Court adopts today has an integrity of its own and is not merely the product of the hydraulic pressures associated with hard cases or strong words.

## II

The constitutional violation that gave rise to the decision in *Williams I* is neither acknowledged nor fairly explained in the Court's opinion. Yet the propriety of admitting evidence relating to the victim's body can only be evaluated if that constitutional violation is properly identified.

Before he was taken into custody, Williams, as a recent escapee from a mental hospital who had just abducted and murdered a small child, posed a special threat to public safety. Acting on his lawyer's advice, Williams surrendered to the Davenport police. The lawyer notified the Des Moines police of Williams' imminent surrender, and police officials,

---

[1] As I wrote at the time:

"Nothing we write, no matter how well reasoned or forcefully expressed, can bring back the victim of this tragedy or undo the consequences of the official neglect which led to the respondent's escape from a state mental institution. The emotional aspects of the case make it difficult to decide dispassionately, but do not qualify our obligation to apply the law with an eye to the future as well as with concern for the result in the particular case before us." 430 U. S., at 415 (concurring opinion).

in the presence of Detective Leaming, agreed that Williams would not be questioned while being brought back from Davenport. Williams was advised of this agreement by his attorney. After he was arraigned in Davenport, Williams conferred with another lawyer who was acting as local counsel. This lawyer reminded Williams that he would not be questioned. When Detective Leaming arrived in Davenport, local counsel stressed that the agreement was to be carried out and that Williams was not to be questioned. Detective Leaming then took custody of respondent, and denied counsel's request to ride to Des Moines in the police car with Williams. The "Christian burial speech" occurred during the ensuing trip.[2] As JUSTICE POWELL succinctly observed, this was a case "in which the police deliberately took advantage of an inherently coercive setting in the absence of counsel, contrary to their express agreement." *Id.*, at 414, n. 2 (concurring opinion).

The Sixth Amendment guarantees that the conviction of the accused will be the product of an adversarial process, rather than the *ex parte* investigation and determination by the prosecutor.[3] *Williams I* grew out of a line of cases in which this Court made it clear that the adversarial process protected by the Sixth Amendment may not be undermined by the strategems of the police.

*Spano* v. *New York*, 360 U. S. 315 (1959), dealt with the confession of an uncounseled defendant after prolonged interrogation subsequent to his indictment for first-degree

---

[2] These are the facts found in *Williams I*. See 430 U. S., at 390–393. As Professor Kamisar has demonstrated, there are a number of unexplained ambiguities in the record. Kamisar, Foreword: *Brewer v. Williams*—A Hard Look at a Discomfiting Record, 66 Geo. L. J. 209 (1977). Nevertheless, this account of the facts was the basis for *Williams I*, and neither party seeks reexamination of those findings.

[3] See, *e. g.*, *Strickland* v. *Washington*, 466 U. S. 668, 685–687 (1984); *United States* v. *Cronic*, 466 U. S. 648, 655–657 (1984); *Polk County* v. *Dodson*, 454 U. S. 312, 318 (1981); *Herring* v. *New York*, 422 U. S. 853, 862 (1975); *Anders* v. *California*, 386 U. S. 738, 743 (1967).

murder.   Four Justices indicated that this questioning vio-
lated the Sixth Amendment, noting that to hold otherwise
would totally undermine the adversarial process of proof:

> "Our Constitution guarantees the assistance of counsel
> to a man on trial for his life in an orderly courtroom, pre-
> sided over by a judge, open to the public, and protected
> by all the procedural safeguards of the law.   Surely a
> Constitution which promises that much can vouchsafe no
> less to the same man under midnight inquisition in the
> squad room of a police station." *Id.*, at 327 (Stewart, J.,
> concurring, joined by Douglas and BRENNAN, JJ.).

As Justice Douglas asked: "[W]hat use is a defendant's right
to effective counsel at every stage of a criminal case if, while
he is held awaiting trial, he can be questioned in the absence
of counsel until he confesses?   In that event the secret trial
in the police precincts effectively supplants the public trial
guaranteed by the Bill of Rights." *Id.*, at 326 (Douglas, J.,
concurring, joined by Black and BRENNAN, JJ.).

This view ripened into a holding in *Massiah* v. *United
States*, 377 U. S. 201 (1964): "We hold that the petitioner was
denied the basic protections of [the Sixth Amendment] when
there was used against him at his trial evidence of his own
incriminating words, which federal agents had deliberately
elicited from him after he had been indicted and in the ab-
sence of his counsel." *Id.*, at 206.   *Williams I* held that
Detective Leaming had violated "the clear rule of *Massiah*"
by deliberately eliciting incriminating statements from re-
spondent during the pendency of the adversarial process and
outside of that process.   See 430 U. S., at 399–401.   The
violation was aggravated by the fact that Detective Leaming
had breached a promise to counsel, an act which can only un-
dermine the role of counsel in the adversarial process.[4]   The

---

[4] "The defendant placed his trust in an experienced Iowa trial lawyer who
in turn trusted the Iowa law enforcement authorities to honor a commit-
ment made during negotiations which led to the apprehension of a poten-
tially dangerous person.   Under any analysis, this was a critical stage of

"Christian burial speech" was nothing less than an attempt to substitute an *ex parte*, inquisitorial process for the clash of adversaries commanded by the Constitution.[5]   Thus the now-familiar plaint that "'[t]he criminal is to go free because the constable has blundered,'" *ante*, at 447 (quoting *People* v. *Defore*, 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926)), is entirely beside the point.   More pertinent is what THE CHIEF JUSTICE wrote for the Court on another occasion: "This is not a case where, in Justice Cardozo's words, 'the constable . . . blundered,' rather, it is one where the 'constable' planned an impermissible interference with the right to the assistance of counsel."   *United States* v. *Henry*, 447 U. S. 264, 274–275 (1980) (footnote and citation omitted).[6]

---

the proceeding in which the participation of an independent professional was of vital importance to the accused and to society.   At this stage—as in countless others in which the law profoundly affects the life of the individual—the lawyer is the essential medium through which the demands and commitments of the sovereign are communicated to the citizen.   If, in the long run, we are seriously concerned about the individual's effective representation by counsel, the State cannot be permitted to dishonor its promise to this lawyer."   430 U. S., at 415 (STEVENS, J., concurring) (footnote omitted).   See also *id.*, at 401, n. 8.

[5] "The whole point of *Massiah* is the prevention of the state from taking advantage of an uncounseled defendant once sixth amendment rights attach.   The Christian burial speech was an attempt to take advantage of Williams.   The attempt itself *is* what *Massiah* prohibits.   The attempt itself violates the constitutional mandate that the system proceed, after some point, only in an accusatorial manner."   Grano, *Rhode Island v. Innis:* A Need to Reconsider the Constitutional Premises Underlying the Law of Confessions, 17 Am. Crim. L. Rev. 1, 35 (1979) (emphasis in original).

[6] See also 430 U. S., at 409 (MARSHALL, J., concurring).   The theme of THE CHIEF JUSTICE's dissenting opinion in *Williams I* seems to permeate the opinion he has written for the Court today, even to the extent of again using the familiar hypothetical found in *People* v. *Defore*.   Compare the discussion of Judge Cardozo's "grim prophecy," 430 U. S., at 416–417 (dissenting opinion), with *ante*, at 447–448.   See also *Stone* v. *Powell*, 428 U. S. 465, 502 (1976) (BURGER, C. J., concurring); *Bivens* v. *Six Unknown Federal Narcotics Agents*, 403 U. S. 388, 413, and n. 3 (1971) (BURGER, C. J., dissenting); *Killough* v. *United States*, 114 U. S. App. D. C. 305, 323, 315 F. 2d 241, 259 (1962) (en banc) (Burger, J., dissenting).

## III

Once the constitutional violation is properly identified, the answers to the questions presented in this case follow readily. Admission of the victim's body, if it would have been discovered anyway, means that the trial in this case was not the product of an inquisitorial process; that process was untainted by illegality. The good or bad faith of Detective Leaming is therefore simply irrelevant. If the trial process was not tainted as a result of his conduct, this defendant received the type of trial that the Sixth Amendment envisions. See *United States* v. *Morrison*, 449 U. S. 361 (1981); *Weatherford* v. *Bursey*, 429 U. S. 545 (1977); *United States* v. *Wade*, 388 U. S. 218, 240–243 (1967). Generalizations about the exclusionary rule employed by the majority, see *ante*, at 443–448, simply do not address the primary question in the case.

The majority is correct to insist that any rule of exclusion not provide the authorities with an incentive to commit violations of the Constitution. *Ante*, at 445–446. If the inevitable discovery rule provided such an incentive by permitting the prosecution to avoid the uncertainties inherent in its search for evidence, it would undermine the constitutional guarantee itself, and therefore be inconsistent with the deterrent purposes of the exclusionary rule.[7] But when the burden of proof on the inevitable discovery question is placed on the prosecution, *ante*, at 444, *it* must bear the risk of error in the determination made necessary by its constitutional violation. The uncertainty as to whether the body would

---

[7] See *Stovall* v. *Denno*, 388 U. S. 293, 297 (1967); *Gilbert* v. *California*, 388 U. S. 263, 272–273 (1967). See also *Moore* v. *Illinois*, 434 U. S. 220 (1977). See generally, *e. g.*, *Stone* v. *Powell*, 428 U. S., at 484; *United States* v. *Janis*, 428 U. S. 433, 443, n. 12 (1976); *United States* v. *Calandra*, 414 U. S. 338, 347–348 (1974); *Terry* v. *Ohio*, 392 U. S. 1, 29 (1968); *Tehan* v. *United States ex rel. Shott*, 382 U. S. 406, 413 (1966); *Mapp* v. *Ohio*, 367 U. S. 643, 656 (1961); *Elkins* v. *United States*, 364 U. S. 206, 217 (1960).

have been discovered can be resolved in its favor here only because, as the Court explains *ante*, at 448–450, petitioner adduced evidence demonstrating that at the time of the constitutional violation an investigation was already under way which, in the natural and probable course of events, would have soon discovered the body. This is not a case in which the prosecution can escape responsibility for a constitutional violation through speculation; to the extent uncertainty was created by the constitutional violation the prosecution was required to resolve that uncertainty through proof.[8] Even if Detective Leaming acted in bad faith in the sense that he deliberately violated the Constitution in order to avoid the possibility that the body would not be discovered, the prosecution ultimately does not avoid that risk; its burden of proof forces it to assume the risk. The need to adduce proof sufficient to discharge its burden, and the difficulty in predicting whether such proof will be available or sufficient, means that the inevitable discovery rule does not permit state officials to avoid the uncertainty they would have faced but for the constitutional violation.

The majority refers to the "societal cost" of excluding probative evidence. *Ante*, at 445. In my view, the more relevant cost is that imposed on society by police officers who decide to take procedural shortcuts instead of complying with the law. What is the consequence of the shortcut that Detective Leaming took when he decided to question Williams in this case and not to wait an hour or so until he arrived in

---

[8] I agree with the majority's holding that the prosecution must prove that the evidence would have been inevitably discovered by a preponderance of the evidence rather than by clear and convincing evidence, *ante*, at 444–445, n. 5. An inevitable discovery finding is based on objective evidence concerning the scope of the ongoing investigation which can be objectively verified or impeached. Hence an extraordinary burden of proof is not needed in order to preserve the defendant's ability to subject the prosecution's case to the meaningful adversarial testing required by the Sixth Amendment. See *United States* v. *Cronic*, 466 U. S., at 655–657.

Des Moines?[9] The answer is years and years of unnecessary but costly litigation. Instead of having a 1969 conviction affirmed in routine fashion, the case is still alive 15 years later. Thanks to Detective Leaming, the State of Iowa has expended vast sums of money and countless hours of professional labor in his defense. That expenditure surely provides an adequate deterrent to similar violations; the responsibility for that expenditure lies not with the Constitution, but rather with the constable.

Accordingly, I concur in the Court's judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

In *Brewer* v. *Williams*, 430 U. S. 387 (1977), we held that the respondent's state conviction for first-degree murder had to be set aside because it was based in part on statements obtained from the respondent in violation of his right to the assistance of counsel guaranteed by the Sixth and Fourteenth Amendments. At the same time, we noted that, "[w]hile neither Williams' incriminating statements themselves nor any testimony describing his having led the police to the victim's body can constitutionally be admitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event." *Id.*, at 407, n. 12.

To the extent that today's decision adopts this "inevitable discovery" exception to the exclusionary rule, it simply acknowledges a doctrine that is akin to the "independent source" exception first recognized by the Court in *Silverthorne Lumber Co.* v. *United States*, 251 U. S. 385, 392 (1920). See *United States* v. *Wade*, 388 U. S. 218, 242 (1967);

---

[9] In this connection, it is worth noting, as JUSTICE MARSHALL did in *Williams I*, that in light of the assistance that respondent's attorney had provided to the Des Moines police, it seems apparent that the lawyer intended to learn the location of the body from his client and then reveal it to the police. See 430 U. S., at 407–408 (concurring opinion). Thus, the need for a shortcut was practically nonexistent.

*Wong Sun* v. *United States,* 371 U. S. 471, 487 (1963).   In particular, the Court concludes that unconstitutionally ·obtained evidence may be admitted. at trial if it inevitably would have been discovered in the same condition by an independent line of investigation that was already being pursued when the constitutional violation occurred.   As has every Federal Court of Appeals previously addressing this issue, see *ante,* at 440–441, n. 2, I agree that in these circumstances the "inevitable discovery" exception to the exclusionary rule is consistent with the requirements of the Constitution.

In its zealous efforts to emasculate the exclusionary rule, however, the Court loses sight of the crucial difference between the "inevitable discovery" doctrine and the "independent source" exception from which it is derived.   When properly applied, the "independent source" exception allows the prosecution to use evidence only if it was, in fact, obtained by fully lawful means.   It therefore does no violence to the constitutional protections that the exclusionary rule is meant to enforce.   The "inevitable discovery" exception is likewise compatible with the Constitution, though it differs in one key respect from its next of kin: specifically, the evidence sought to be introduced at trial has not actually been obtained from an independent source, but rather would have been discovered as a matter of course if independent investigations were allowed to proceed.

In my view, this distinction should require that the government satisfy a heightened burden of proof before it is allowed to use such evidence.   The inevitable discovery exception necessarily implicates a hypothetical finding that differs in kind from the factual finding that precedes application of the independent source rule.   To ensure that this hypothetical finding is narrowly confined to circumstances that are functionally equivalent to an independent source, and to protect fully the fundamental rights served by the exclusionary rule, I would require clear and convincing evidence before concluding that the government had met its burden of proof on this issue.   See *Wade, supra,* at 240.   Increasing the burden of

proof serves to impress the factfinder with the importance of the decision and thereby reduces the risk that illegally obtained evidence will be admitted. Cf. *Addington* v. *Texas*, 441 U. S. 418, 427 (1979); *Santosky* v. *Kramer*, 455 U. S. 745, 764 (1982) ("Raising the standard of proof would have both practical and symbolic consequences"). Because the lower courts did not impose such a requirement, I would remand this case for application of this heightened burden of proof by the lower courts in the first instance. I am therefore unable to join either the Court's opinion or its judgment.