# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 13, 2005 at Knoxville

## STATE OF TENNESSEE v. ALEJANDRO GONZALEZ

### Appeal from the Criminal Court for Davidson County
### No. 2003-D-3032      Cheryl Blackburn, Judge

---

### No. M2005-00756-CCA-R3-CD - Filed February 8, 2006

---

The defendant, Alejandro Gonzalez, appeals a certified question of law following his guilty plea to possession of cocaine, within 1000 feet of a school, with intent to sell or deliver, an offense for which he received an eight-year sentence to be served in a community corrections program.  The question certified for appeal is whether a Metro Nashville police officer had sufficient cause to search a grocery bag the defendant was carrying, in which the officer found 26 grams of cocaine.  Because we hold that the search was lawful and that the fruits thereof were admissible, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID G. HAYES, JJ., joined.

Vanessa Saenz, Nashville, Tennessee, for the Appellant, Alejandro Gonzalez.

Paul G. Summers, Attorney General & Reporter; Mark A. Fulks, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rob McGuire, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The evidence presented at the hearing on the defendant's motion to suppress showed that on the evening of September 19, 2003, a food inspector with the Metro Public Health Department, a representative of the fire marshal's office, a sanitation inspector, and three police officers – a team described as an Environmental Task Force – arrived at the Mexican Typical Bar, an establishment operated by the defendant.  Their purpose was to conduct a semiannual inspection to determine compliance with public health, sanitation, and fire safety laws and regulations.  The establishment had last been inspected on January 21, 2003, and was due for inspection.[1]

---

[1] The food inspector testified that the defendant's establishment failed the January 21 inspection but passed

(continued...)

The food inspector testified that her job was to focus on whether food served in restaurants and markets came from authorized sources, was kept at proper temperatures, and was handled in properly sanitized containers by workers who follow hygienic practices. She testified that she had inspected other locations earlier in the day on September 19, and she inspected the Mexican Typical Bar in the evening hours because the establishment was only open at night. She testified that the inspections are conducted, when due, without prior notice or warning. She testified that she was authorized to inspect food for "take-out" before it is handed over to the consumer; however, she had never before stopped a "delivery" person who was carrying food away from the premises being inspected.

The food inspector testified that, after she had been in the defendant's establishment for about 20 minutes and was working in the kitchen area, she saw the defendant, whom she knew as the owner of the business, take a plastic, grocery-type bag from a cooler and walk toward the door. She believed that the bag contained food that could have come from an unauthorized source or could have been "out of temperature." Not wanting to yell across the bar for the defendant to stop, she asked one of the escorting police officers to stop the defendant and to bring him back with the bag because she suspected the bag contained food. The officer followed the defendant out the door.

The officer testified that he had eleven years' experience as a police officer and had conducted about 100 narcotics arrests. He had served as a member of the Environmental Task Force for eight or nine years as an adjunct to his regular patrol duties. As a task force member, he and two other officers escorted the inspectors when night-time inspections were performed. His role was to ensure the safety of the inspectors. On the evening of September 19, 2003, the Mexican Typical Bar was the second or third establishment the team visited, and the team conducted other inspections after they left the Mexican Typical Bar.

The officer testified that he was standing in the door to the kitchen when the food inspector told him that she suspected that a bag being carried out by the defendant contained food, that she needed to inspect the bag, and that he should stop the defendant and bring him back inside with the bag. The officer testified that, after he and the defendant had taken five or six steps outside the building, he asked the defendant to stop and told him that he needed to see what was in the bag. The officer testified that the defendant began to search through the bag, selecting items to pull out. Ultimately, the defendant pulled out a quart can of acetone, a coffee grinder, a small set of electronic scales, some plastic sandwich bags, and some "GNC" powder. According to the officer, the defendant endeavored to remove some items while leaving others in the bag. The officer concluded that the presence of the electronic scales, which in his opinion would not be found typically in a restaurant operation, and the sandwich bags suggested trafficking in drugs. He informed the defendant that he needed to see the remaining contents of the bag, took the bag from the defendant, and found 26 grams of cocaine inside.

---

[1](...continued)
on January 22, 2003.

The defendant testified that he did not pull any items from the plastic bag; rather, the officer took the bag and removed the items himself.

The trial court overruled the motion to suppress the cocaine found in the plastic bag. Ultimately, the defendant entered a best-interests guilty plea, reserving and certifying for appellate review the suppression issue. For the following reasons, we affirm the trial court's denial of relief.

On appeal, the defendant claims that he was not suspected of committing any crime when he was detained and that the warrantless search of his grocery bag was unsupported by probable cause. Moreover, the defendant argues that the gradual removal of innocuous items from the grocery bag, at some point before the cocaine was found, dispelled any suspicion that the bag contained food. The state argues that the search and seizure are justified by state law requiring the administrative inspection of enterprises serving food to the public, as well as by constitutional caselaw that recognizes warrantless searches that are incidental to arrest. In any event, the state claims that the cocaine was admissible in evidence because its discovery was inevitable.

*I. Standard of Review.*

When reviewing a trial court's findings of fact and conclusions of law on a motion to suppress evidence, we are guided by the standard of review set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. When the trial court, however, does not set forth its findings of fact upon the record of the proceedings, this court determines where the preponderance of the evidence lies. *Fields v. State*, 40 S.W.3d 450, 457 n.5 (Tenn. 2001); *see also Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *See State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Furthermore, we review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. *See, e.g., State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

*II. Search and Seizure Limitations.*

The Fourth Amendment to the United States Constitution provides:

> Unreasonable searches and seizures. – The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. Const. amend. IV. Similarly, Article 1, § 7 of the Tennessee Constitution guarantees

> that the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Tenn. Const. art. 1, § 7. The intent and purpose of the prohibition against unreasonable searches and seizures found in the Tennessee Constitution have been held to be the same as found in the Fourth Amendment to the United States Constitution. *See State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). Under both the United States and the Tennessee Constitutions, a search or seizure conducted without a warrant is presumed unreasonable. *See Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971); *State v. Watkins*, 827 S.W.2d 293, 295 (Tenn. 1992). Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless that search or seizure was conducted pursuant to one of the recognized exceptions to the warrant requirement. *See Watkins*, 827 S.W.2d at 295.

<em>III. Exceptions to Inadmissibility of<br>Fruits of Warrantless Search.</em>

A. Administrative Search Exception.

One recognized exception to the warrant requirement is known as the "pervasively regulated business doctrine." *See New York v. Burger*, 482 U.S. 691, 699-703, 107 S. Ct. 2636, 2642-44 (1987) (operation of a junkyard pervasively regulated); *Donovan v. Dewey*, 452 U.S. 594, 598-600, 101 S. Ct. 2534, 2537-38 (1981) (coal mining pervasively regulated); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311-13, 98 S. Ct. 1816, 1820-21 (1978) (warrantless inspections to enforce OSHA regulations not authorized by pervasively regulated business doctrine); *United States v. Biswell*, 406 U.S. 311, 92 S. Ct. 1593 (1972) (firearms pervasively regulated); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S. Ct. 774 (1970) (liquor pervasively regulated). Although the Fourth Amendment's protections against unreasonable searches and seizures apply to private commercial property, under the pervasively regulated business doctrine, administrative searches of private commercial property conducted without a search warrant pursuant to legislative schemes authorizing such searches do not necessarily violate the Fourth Amendment. *See Dewey*, 452 U.S. at 598-99, 101 S. Ct. at 2537-38. This doctrine "reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections." *Id*., 101 S. Ct. 2537-38. Because of the pervasiveness of government regulations in certain industries, business owners or operators in those "closely regulated" industries have a reduced expectation of privacy in

their business operations. *See Burger*, 482 U.S. at 702, 107 S. Ct. at 2643-44. Thus, because of the reduced expectation of privacy in heavily or pervasively regulated businesses, the Supreme Court has determined that "the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context." *See id.*, 107 S. Ct. at 2643. To be reasonable under the Fourth Amendment, however, an administrative search or inspection pursuant to the pervasively regulated business doctrine must satisfy three criteria.

> First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made.
>
> Second, the warrantless inspections must be "necessary to further [the] regulatory scheme."
>
>     . . . .
>
> Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.

*Id.* at 702-03, 107 S. Ct. at 2644 (citations omitted).

B. Inevitable Discovery Rule.

Even if no recognized exception to the warrant requirement would pave the way for the admission of evidence obtained via a warrantless search, the evidence may still be admissible when its discovery by state actors would have been inevitable. Under the inevitable discovery doctrine, illegally obtained evidence is admissible when the evidence would have inevitably been discovered by lawful means. *See State v. Patton*, 898 S.W.2d 732, 735 (Tenn. Crim. App. 1994) (citing *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501 (1984)). Proof of inevitable discovery may involve "no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 467 U.S. at 444 n.5, 104 S. Ct. at 2509 n.5; *see State v. Cothran*, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003) (under inevitable discovery doctrine, illegally obtained evidence is admissible if the evidence would have otherwise been discovered by lawful means).

*IV. Application.*

In Tennessee, "[n]o person shall operate a . . . food service establishment who does not hold a valid permit issued . . . on or before July 1 of each year." Tenn. Code Ann. § 68-14-305(a) (2001). Permits to operate food service establishments may be suspended or even revoked when the commissioner of health determines via on-site inspections that the establishment is not in compliance with public health laws and regulations. *See id*. §§ 68-14-306, -307, -308 & -317 (2001); §§ 53-8-205(4) (requiring semiannual inspections of food service establishments), -209 & -210 (providing for suspension and revocation of permits) (2001). Furthermore, "a legal agent of the state department of agriculture has full power at all times to enter every building, room, basement or cellar occupied or used . . . for the production for sale, . . . storage, sale, distribution or transportation of food, and to inspect the premises." *Id.* § 53-8-115 (1999); *see also id.* §§ 53-8-205(7)(b) (2001) (providing for authority of commissioner of agriculture to be exercised by local health departments) & -202 (2001) (declaring legislative intent to "eliminate duplicate inspections of retail food stores"). "Food may be examined or sampled by [inspectors] as deemed necessary for the enforcement of this part." *Id.* § 68-14-319 (2001); *see also id.* §§ 53-8-218(a) (1999) (similarly empowering agents of the commissioner of agriculture), -1-104 (1999) (defining "adulterated" food, including temperature requirements for food storage), 68-1-103(a) (2001) (empowering the commissioner of health to adopt rules and regulations). A person commits a Class C misdemeanor who "fails or refuses to comply with any of the [applicable rules and regulations], or obstructs or hinders the regulatory authority in the discharge of the regulatory authority's duties or otherwise operates a . . . food service establishment in violation of [the provisions for inspection] or rules and regulations." *Id.* § 68-14-322 (2001); *see id.* §§ 53-8-221 (1999) (sanctioning similar activity as a Class C misdemeanor) & -115 (proscribing as a Class C misdemneanor a refusal to comply with provisions for inspection).

Based upon these provisions for ensuring the public health, we have no difficulty in determining that the food inspector in the present case was authorized to enter and inspect the defendant's commercial premises, where, indisputably, food was served. We likewise have no difficulty in discerning that a substantial government interest attends the regulation of public food service. The prevention of disease is a vital concern to the public and the state government, and the imperative for regulation is obvious. *See id.* § 68-1-104 (2001) (charging commissioner of health to supervise "the interests of health and life of the citizens of this state"). Furthermore, we hold that the prescribed warrantless inspections, as means of deterring safety and health violations, are necessary to further the regulatory scheme. *See Burger*, 482 U.S. at 702-03, 107 S. Ct. at 2644. Finally, per the *Burger* regimen, we hold that the Tennessee scheme for food regulation advises the establishment owner that unannounced semiannual inspections with a properly defined scope will be performed and that the scheme, through specificity of materials and conditions to be examined, limits the discretion of the inspectors. *See id*., 107 S. Ct. at 2641.

Therefore, based upon the statutory scheme for inspection of the Mexican Typical Bar as a closely regulated business and the constitutional largess that permits such inspections to be performed without a warrant, the food inspector in the present case did not perform an unreasonable

-6-

search or seizure when, through delegating her authority to another state officer, she undertook to search the bag being carried away from the premises by the defendant. She held a reasonable belief that the bag contained food, and as stated above, she was authorized to examine food "as necessary" to enforce the regulations. We deem it reasonable and necessary in the present case for the inspector to examine the contents of a grocery bag that the defendant took from a cooler during the course of the inspection and tried to remove from the premises. We note that the defendant, as the owner or operator of the establishment, had received a failing score on the initial visit of the most recent prior inspection. We discern that prohibiting the inspector from investigating the defendant's removal of a grocery bag that reasonably might contain non-complying foodstuffs would frustrate the purpose and effect of a legitimate regulatory scheme, thus endangering the public. The result is that the fruits of the detention and search were generally admissible – subject to the scope of the search being itself reasonable.

In this regard, the defendant claims that the defendant's gradual revealing of contents of the bag should have dispelled any notion that the bag contained food. We are unpersuaded by this argument, however. We believe the officer was initially authorized to do what the defendant actually claimed he did – take the bag from him at the outset and search it himself. The officer was not constrained to bide the defendant's orchestration of the search of the bag. If the officer was authorized to detain the defendant, as we have determined, he was certainly authorized to carry out the activity that the detention was intended to allow.

In passing, we observe that we need not resort to the inevitable discovery rule as a basis for affirming the trial court's action. The inspector, and through her the police officer, had the necessary and reasonable authority to thoroughly search an opaque grocery bag that the defendant procured from an apparent food storage area. The officer's actions constituted the inspector's search, thus obviating the need to theorize a subsequent, inevitable search by the inspector herself.

*V. Conclusion.*

Finding no error in the trial court's determination, we affirm the conviction.

_____
JAMES CURWOOD WITT, JR., JUDGE