COURT OF APPEALS OF VIRGINIA


Present:  Judges Bray, Bumgardner and Frank
Argued at Chesapeake, Virginia


EUGENE WILKINS
                                             OPINION BY
v.    Record No. 2973-00-1           JUDGE ROBERT P. FRANK
                                          FEBRUARY 12, 2002
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF SUFFOLK
                    D. Arthur Kelsey, Judge

          James O. Broccoletti (Zoby & Broccoletti, on
          brief), for appellant.

          Eugene Murphy, Assistant Attorney General
          (Randolph A. Beales, Attorney General, on
          brief), for appellee.


     Eugene Wilkins (appellant) was convicted in a bench trial

of two counts of possession with intent to distribute cocaine,

in violation of Code § 18.2-248.  On appeal, appellant contends

the trial court erred in ruling (1) appellant was properly

informed of his Miranda rights; (2) the search warrant was

issued based on probable cause; (3) appellant's vehicle was

properly searched; and (4) the evidence seized in the vehicle

was admissible.  For the reasons stated, we affirm the

convictions.

                      I.  BACKGROUND

     On February 25, 1999, Detective Frank Chappell of the

Portsmouth Police Department was working with an informant who

previously had provided information resulting in at least one arrest. The informant reported that for some time he had been buying quantities of narcotics from appellant and Calvin West. He explained that appellant delivered the drugs to West's home on Brookwood Drive in Suffolk, where the drugs then were sold. The informant described appellant's vehicle as a blue van "with a wood grain." As the informant and Chappell were driving to appellant's home, Chappell saw the blue van. They changed direction and followed the van to West's residence, where informant made a controlled purchase.

According to the informant, appellant and West sold drugs at West's home from early morning to early afternoon. Appellant would deliver the drugs to West in the morning and come back later in the afternoon to pick up the proceeds. If the porch light was on at West's residence, then no drugs were for sale; if the light was off, then drugs could be purchased.

On June 16, 1999, the police began surveillance of West's and appellant's homes. Early that morning, appellant was observed driving from his residence on Water View Drive to West's home.

That same day, a different informant made a controlled buy at West's residence. He was unable to buy the drugs before appellant arrived. After appellant arrived, however, the porch light was switched off, and the informant then purchased narcotics.

On June 17, the confidential informant again went to West's home before appellant arrived and was told no narcotics were available. The porch light was on, and West told the informant that he was waiting for appellant to arrive with the cocaine. On that day, appellant left his home and stopped at 3943 Bridge Road, his mother's home, where he got out of his car and walked to the side of the house behind a large tree. "All [the police] could see was that he went to the side of the house or towards the side of the garage area," where he remained out of view for a few minutes. He then returned to his van and drove directly to West's residence. The confidential informant then made a purchase from appellant at West's home.

On June 18 at 9:00 a.m., the informant again attempted to make a purchase while the light was on, but West told him that appellant would be "en route shortly with some [cocaine]." At about the same time, appellant was observed driving into a Farm Fresh parking lot. Appellant met with an individual and then proceeded to Bridge Road. At Bridge Road, appellant again got out of the van and went to the side of the house for a short time. He then drove back to his residence, left again at 9:35 a.m., and drove to West's house.

Search warrants were obtained for both appellant's and West's residences. Appellant was stopped at approximately 9:45 a.m. "within a block or two from West's house," and the police searched his van. They found cocaine in sweatpants that

were lying in the van between the driver and passenger seats. The police did not find any drugs on appellant.

Both the Brookwood and Waterview houses were searched. No drugs were found at either address. The arresting officers brought appellant back to the Waterview house, but appellant made no statement to Chappell or to any other officer while Chappell was there. Chappell then left to obtain a search warrant for the Bridge Road property. Chappell testified, "[B]ased on what the surveillance was and the observation was, then I felt there was a reason to go to Bridge Road." Chappell went to the magistrate and obtained a search warrant for that address.

In the affidavit presented to the magistrate to obtain the search warrant for the Bridge Road residence, Chappell stated:

> On 6-17-99, CI#2 was sent to 6117 Brookwood Dr. to purchase cocaine. CI#2 was told by "C.W." that he didn't have anymore cocaine and that he was waiting for "Gene" who was still at home to bring over the cocaine.
>
> Surveillance was again established at 100 Waterview Rd. The home of Wilkins. Wilkins van was parked in the driveway of said address. Wilkins was observed coming out of the house carr[y]ing a white bag, he got into the van and drove to 6117 Brookwood Dr. Prior to stopping at 6117 Brookwood Dr., Wilkins stopped at 3943 Bridge Rd.[,] exited the van and was observed going towards the side door.
>
> CI#2 was given money and sent to 6117 Brookwood Dr. to purchase cocaine. Prior to leaving the CI#2 was searched and found to have no controlled substances. CI#2 was observed going to and inside 6117 Brookwood Dr. CI#2 purchased cocaine from "Gene."

CI#2 advised that "Gene" and "C.W." had just got through cutting up a quantity of cocaine.

 *      *      *      *      *      *      *

On 6-18-99, surveillance was established at 100 Waterview Rd. by Det. DeFreitas. Wilkins was observed coming out of the house and getting into his van, Virginia tag HP/56-561.  Wilkins was then followed to a shopping center in the City of Chesapeake, Va. where he met up with a black male. After a brief conversation both Wilkins and the unknown left in different direction[s]. Wilkins was followed where he stopped at 3943 Bridge Rd. Got out of the vehicle and went up to the side of the house.  Wilkins th[e]n returned a short time later and drove back directly back to his home at 100 Waterview Rd.

During the time Wilkins was driven back to his home, CI#2 was at the home of "C.W." as directed by this [affiant] in attempts to purchase cocaine.  "C.W." told CI#2 that he didn't have any cocaine and that he was on the phone with "Gene".  "C.W." added that "Gene" would be at the house shortly with cocaine.  As this phone conversation was occurring between "Gene" and "C.W." Det. Karpowski observed "Gene" talking on a cellular phone while riding down the street.

At approximately 9:45 A.M., Eugene Wilkins was arrested with a quantity of cocaine on his person.  When asked about where he had been earlier that morning Wilkins stated that he had only went to the Food Lion and got some bananas and went back home.

Parked in the driveway of 3943 Bridge is a 1978 red & white Chevy El Camaro with Virginia tag PTQ-920.  The registered owner is Eugene Wilkins.  It was further learned that Wilkins 89 year old mother lives at the address.

Chappell, on cross-examination, conceded the police never saw appellant enter the El Camino or the Bridge Road house on

either visit.  The affidavit did not mention that appellant was briefly hidden from view by a "big tree" at the side of the house while at Bridge Road.

The search warrant was signed at 1:30 p.m.  Chappell then called Detective M.K. Wright, who was already at the Bridge Road house.  When Chappell told him that he had obtained the warrant, Wright entered the El Camino, which was parked behind the big tree on the side of the house, and recovered a brown paper bag containing cocaine.

While Chappell went to get the search warrant, Detective L.L. DeFreitas remained with appellant at the Waterview Road house.  DeFreitas testified he <u>Mirandized</u> appellant from memory, and appellant said he understood those rights.  The detective then asked whether appellant wished to speak with him without an attorney present, and appellant replied that he would.  Around noon, appellant said he wanted to speak to a lawyer, and DeFreitas stopped his conversation with appellant.  Appellant's wife, who was also present, "constantly" urged appellant to speak with the police and cooperate.

Around 2:30 p.m. appellant asked DeFreitas if he could talk with him in another room.  At that point, appellant said he wished to cooperate and tell them where the drugs could be found. DeFreitas responded that he could not talk to appellant because he had asked for a lawyer.  Appellant said he had changed his mind and wanted to talk.  Appellant then said he would take the officer to the place where the drugs were located.

They drove to the Bridge Road address. Appellant led the detective to the El Camino[1] and indicated the drugs were in the backseat. They then learned the drugs had already been recovered by other officers pursuant to the search warrant. The trial judge found they "arrived only moments after Detective Wright recovered the evidence."

Later that day, after DeFreitas described the surveillance to him, appellant said, "Okay, so you know that I come here, pick it up, and then go over to CW's. I only sold a little. I use as well. It's for pain. What's the difference, I'll be gone soon anyway." When he asked how much he sold, appellant said he needed to talk to an attorney, and the conversation ceased.

## II. MIRANDA RIGHTS

Appellant claims the evidence was insufficient for the trial court to find DeFreitas informed appellant of all his rights under Miranda v. Arizona, 384 U.S. 436 (1966). In examining this claim, the evidence is considered in the light most favorable to the Commonwealth, and the trial court's determination that appellant was informed of these rights will not be overturned unless plainly wrong or without evidence to support that finding. See Commonwealth v. Benjamin, 28 Va. App. 548, 552-53, 507 S.E.2d 113, 115 (1998).

In the case of Dickerson v. United States, the Supreme Court explained the rule established by Miranda:

> Accordingly, we laid down "concrete
> constitutional guidelines for law
> enforcement agencies and courts to follow."

---

[1] The El Camino was registered in appellant's name.

> [_Miranda_, 384 U.S.] at 442. Those
> guidelines established that the
> admissibility in evidence of any statement
> given during custodial interrogation of a
> suspect would depend on whether the police
> provided the suspect with four warnings.
> These warnings (which have come to be known
> colloquially as "Miranda rights") are: a
> suspect "has the right to remain silent,
> that anything he says can be used against
> him in a court of law, that he has the right
> to the presence of an attorney, and that if
> he cannot afford an attorney one will be
> appointed for him prior to any questioning
> if he so desires." _Id._, at 479.

530 U.S. 428, 435 (2000) (emphasis added). Previously, the

Supreme Court has called them "the now-familiar warnings."

_Rhode Island v. Innis_, 446 U.S. 291, 310 (1980).

The trial court did not err by inferring from the

detective's use of the phrase, "_Miranda_ warnings," during his

testimony that he informed appellant of these four rights,

although the court was not required to make this inference.[2] The

evidence was sufficient to support the trial court's finding.

First, other courts have held that similar testimony was

sufficient to prove the _Miranda_ rights were read to a defendant.

In _Phelps v. Duckworth_, for example:

> At trial, the arresting officer testified
> that he "read [Mr. Phelps] his rights"
> following the arrest. The state argues that
> this testimony does not conclusively show
> that the petitioner was read his _Miranda_

---

[2] Clearly, the Commonwealth risks a finding by the trial
court that the complete warnings were not given where an officer
testifies only that he informed the suspect of his "_Miranda_
rights."

warnings as opposed to some other warnings. The state does not speculate as to what other rights Mr. Phelps reasonably might have been read immediately following his arrest.

The district court found that the record revealed that Mr. Phelps was read his Miranda warnings following arrest. We will not set aside a district court's factual finding unless it is clearly erroneous. In reviewing the lower court finding, we may infer reasonable conclusions drawn from the record as a whole.

We fully agree with the district court that Mr. Phelps was given his Miranda warnings by the arresting officer. To hold otherwise, in light of the arresting officer's own testimony, would contradict reason and common sense. The present case is plainly distinguishable from Fletcher [v. Weir, 455 U.S. 603, 605 (1982)], where there was no evidence in the record that the defendant had been read his rights, Miranda or otherwise. There is nothing in the present record which suggests that the rights read to Mr. Phelps by the arresting officer were not Miranda rights.[3]

757 F.2d 811, 816, rev'd on altern. gds. en banc, 772 F.2d 1410 (7th Cir. 1985). See also State v. Esser, 480 N.W.2d 541, 543-44 (Wis. Ct. App. 1992) (noting "[t]he phrase 'Miranda rights' conjures up the well-known litany of rights which many citizens could recite verbatim," and affirming a trial court's finding that these rights were read to a suspect, based on

---

[3] The prosecution was arguing Mr. Phelps's silence after his arrest could be used to impeach his trial testimony. Phelps, 757 F.2d at 815. Such impeachment evidence is allowed only if a defendant was not read his Miranda rights after his arrest. Id. See generally Doyle v. Ohio, 426 U.S. 610 (1976).

evidence that the officer read his "constitutional rights" to the defendant "from a police department <u>Miranda</u> card" that was not introduced into evidence).

Here, the record supports the trial court's finding. DeFreitas testified that, after he arrested appellant, "I <u>Mirandized</u> him" before beginning their initial conversation. The detective admitted he did not read the rights from a preprinted card, but instead recited them "from [his] memory."[4] He also asked appellant "if he understood his rights," and appellant responded that he did. DeFreitas then "[a]sked him if he wished to talk to me without an attorney present."

The record contains no hint that anything other than the traditional <u>Miranda</u> rights were explained to appellant. While other trial courts might not reach the same conclusion, appellate courts must defer to the judge's factual finding where the evidence supports that finding. <u>See</u> <u>Benjamin</u>, 28 Va. App. at 552–53, 507 S.E.2d at 115. The evidence here supports the trial court's factual finding that appellant was informed of his <u>Miranda</u> rights.

## III. SUPPRESSION OF THE DRUGS

---

[4] Defense counsel did not challenge DeFreitas's memory at trial nor does he challenge it on appeal.

Appellant also claims the evidence found in the El Camino should have been suppressed because the search warrant[5] for the Bridge Road house where the car was parked lacked probable cause and because the car was not listed on the warrant as a place to search.  Even assuming both these arguments are correct, the evidence should not have been suppressed.  The drugs were admissible under the inevitable discovery doctrine even if the warrant and resulting search were improper.

When evidence is collected as the result of an unconstitutional process, normally it should be excluded under the exclusionary rule or as "fruit of the poisonous tree."  However, very limited exceptions to this rule do exist.  One such exception is the inevitable discovery rule, which is an off-shoot of the independent source doctrine.  See Murray v. United States, 487 U.S. 533, 536-39 (1988); Nix v. Williams, 467 U.S. 431, 446-48 (1984); Timbers v. Commonwealth, 28 Va. App. 187, 199-201, 503 S.E.2d 233, 238-39 (1998).

The inevitable discovery exception "has long been recognized in Virginia."  Walls v. Commonwealth, 2 Va. App. 639, 655, 347 S.E.2d 175, 184 (1986).  In order to apply this exception, this Court, in Walls, required a showing that:

> "(1) a reasonable probability [exists] that
> the evidence in question would have been
> discovered by lawful means but for the
> police misconduct, (2) that the leads making

---

[5] The Commonwealth does not argue that appellant lacked standing to object to a search warrant for his mother's home.

> the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternative line of investigation."

Id. at 656, 347 S.E.2d at 185 (quoting United States v. Cherry, 759 F.2d 1196, 1204 (5th Cir. 1985)).

The trial court here concluded the Commonwealth's evidence met this test, finding that DeFreitas arrived "only moments" after Chappell's recovery of the drugs, that the police had appellant in custody prior to any of the alleged misbehavior by Chappell, and that DeFreitas actively pursued the alternative source of information. As this conclusion involves a mixed question of fact and law, we defer to the trial court's factual findings unless plainly wrong or without evidence to support them, but review the ultimate question of law, the application of the inevitable discovery doctrine, de novo. See Trent v. Commonwealth, 35 Va. App. 248, 250, 544 S.E.2d 379, 380 (2001). See also Williams, 467 U.S. at 444 n.5 (inevitable discovery should be proven by a preponderance of the evidence, applying the usual burdens for a motion to suppress).

First, more than a reasonable probability exists that, without the warrant, the police would have recovered the drugs in the El Camino. Obtaining the search warrant had nothing to do with appellant's discussion with DeFreitas. Appellant's decision to voluntarily disclose the location of the drugs provided the police with a completely independent basis for searching the El

Camino.[6]  If the officers had never attempted to obtain a search warrant for the Bridge Road address, they still would have arrested appellant.  This arrest and events at his home, not the search warrant, prompted appellant to disclose to police that the cocaine was in the backseat of the vehicle.

As appellant actually took DeFreitas to the exact location where the police earlier found the drugs, speculation about an abstract future discovery of the drugs is unnecessary.  The evidence here clearly shows discovery of the contraband was more than reasonably probable; it was inevitable, even without the allegedly improper warrant and search.

The second prong of the test was met also.  The police "possessed the lead" at the time they applied to the magistrate for the warrant:  they had appellant, the "lead," in custody and had Mirandized him.  While appellant initially invoked his Miranda rights and did not talk with DeFreitas, the police still had appellant under arrest.  Appellant does not contest the legality of this arrest.

Finally, the officers were actively pursuing this alternative source of information.  DeFreitas initially asked if appellant wanted to talk to the police.  Although appellant appeared uncooperative at that point, the officers did not take

---

[6] Seizure of the drugs based on appellant's statements was constitutionally permissible without a warrant based on both consent to search, Hughes v. Commonwealth, 31 Va. App. 447, 454, 524 S.E.2d 155, 159 (2000) (en banc), and the automobile exception, McCary v. Commonwealth, 228 Va. 219, 227-28, 321 S.E.2d 637, 641-42 (1984).  Appellant does not argue this point.

him to jail, but instead held him in his home.  Clearly, the investigation had not concluded.  The police still wanted to hear any information appellant was willing to disclose.  They were doing all they could do constitutionally, once appellant invoked his Miranda rights, to pursue this lead.[7]

In this case, DeFreitas's lead was completely separate from the alleged police "misconduct" related to the warrant, as appellant's cooperation was obtained independently of the request for the search warrant.[8]  See Cherry, 759 F.2d at 1205  n.11; Walls, 2 Va. App. at 643, 347 S.E.2d at 177.  Chappell, who requested the warrant, did not know about appellant's statements when he submitted his affidavit to the magistrate nor when he began the search at Bridge Road.  DeFreitas did not know what appellant would say or where the drugs would be found.  Appellant did not know about the alleged inadequacies of the warrant and the search.  The warrant and search procedure in no way tainted appellant's disclosure of the location of the drugs because the two investigations were independent.

Appellant argues the alternative lines of investigation also must flow from completely independent sources.  However, he cites no authority to support this interpretation of the rule, and we

---

[7] Appellant was informed of his Miranda rights.  See II, supra.

[8] The record does not indicate whether appellant knew Chappell was attempting to get a search warrant for the Bridge Road residence.  The allegedly improper actions taken by the police in relation to the warrant and search occurred after Chappell left appellant's home.  Nothing suggests that appellant knew about the allegedly improper action or that his decision to talk to DeFreitas was in any way influenced by those actions.

do not believe this prong suggests such an extreme view.  The requirement is only that the alternative line of investigation is not tainted by the allegedly unconstitutional source of information, allowing a court to find that "the police would have obtained that evidence if no misconduct had taken place." Williams, 467 U.S. at 444.  See also Cherry, 759 F.2d at 1205. See, e.g., United States v. Lamas, 930 F.2d 1099, 1103-04 (5th Cir. 1991) (holding that evidence obtained based on Lamas's invalid consent to search his house was admissible under the inevitable discovery rule where an officer had probable cause and left to obtain a search warrant prior to the improper consent).

This analysis is especially applicable here, where if Chappell had never requested the search warrant and never began his search, DeFreitas still would have recovered the cocaine in the backseat of the El Camino, based on appellant's cooperation. In fact, if the process for obtaining the warrant had been slower, the drugs would have been recovered based on appellant's cooperation rather than the execution of the warrant.  Excluding this evidence would exact "the enormous societal cost of excluding truth," while providing no deterrence of police misconduct because an officer "will rarely, if ever, be in a position to calculate whether [this] evidence sought would inevitably be discovered."  Id. at 445.

As the evidence found in the El Camino is admissible under the inevitable discovery doctrine, we do not need to examine appellant's remaining arguments.  Any impropriety related to the

affidavit and the execution of the search at Bridge Road did not taint the independent investigation by DeFreitas.

Because appellant was informed of his <u>Miranda</u> rights, and because the inevitable discovery doctrine allowed introduction of the drugs obtained pursuant to the search warrant, we affirm the convictions.

<u>Affirmed.</u>