COURT OF APPEALS OF VIRGINIA

Present:   Judges Annunziata, Bumgardner and Frank
Argued at Chesapeake, Virginia


DAVID WAYNE SMITH

                                                    OPINION BY
v.      Record No. 2910-02-1                JUDGE ROBERT P. FRANK
                                                    NOVEMBER 25, 2003
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Patricia L. West, Judge

        Michael F. Fasanaro, Jr. (Abrons, Fasanaro & Sceviour, on briefs),
        for appellant.

        Richard B. Smith, Senior Assistant Attorney General (Jerry W.
        Kilgore, Attorney General, on briefs), for appellee.


        David Wayne Smith (appellant) was convicted in a jury trial of first-degree murder, in

violation of Code § 18.2-32.  On appeal, he contends the trial court erred in refusing to grant his

motion to suppress the evidence and in failing to recuse herself.  For the reasons stated, we

affirm the judgment of the trial court.

                                    BACKGROUND

        Martin O'Grady, Guenther Dietz, and appellant shared a townhouse located at 4245

Maplehurst Road in Virginia Beach.  Sometime during the evening of April 2, 2001 or early

morning of April 3rd, O'Grady was awakened by Dietz yelling, "Stop, David.  Don't do it, Dave.

Please stop."  O'Grady testified he was afraid to go downstairs.  He pushed a dresser against the

door and went back to sleep when quiet resumed.

        When O'Grady awoke the next morning, he went into the bathroom and saw a pair of

white bloody sneakers inside the bathtub with water running on them.  O'Grady then went

downstairs, where he found Dietz's body, lying face down in a pool of blood in the living room. O'Grady went back upstairs and quickly dressed. As he passed appellant's room, he closed that door. Appellant was in the room.

O'Grady went to the police station. He reported that Dietz had been murdered and that appellant was still in the house. Sergeant Andrew Spiess, who talked to O'Grady, dispatched two units to the house, advising them there was a probable homicide in the residence and the suspect was still there. He described the suspect as "a white male named Dave."

When Detective Ricardo arrived at the scene, Officers Barger and Johnson were already outside the residence. The front door was open. Ricardo could see "red stains" on the vertical blinds. The three officers entered the house. Ricardo noticed a man lying next to the sliding doors. He was "obviously dead." The officers searched the downstairs and then "started up the stairs."

Officer Johnson found appellant in an upstairs bedroom. Officer Ricardo handcuffed appellant, whom he recognized from a "previous encounter" as Dave Smith. Appellant had a "red kind of tint" to his hand. Ricardo noticed "blood spatter" on appellant's socks, "some blood on his right leg and his shin area."

Officer Ricardo walked appellant out of the house and placed him in a police vehicle. He did not search the house any further prior to taking appellant outside because "[I]n the expediency of getting him out and my knowing his name and face, recognizing him already as David Smith, with the information I knew, my expediency was getting him out of the house first."

The officer testified:

> I returned back to that house to once again just make a quick
> cursory search for the safety of the other officers. Obviously based
> on my training and experience, there was a dead body in the house,
> and I wanted to make sure that the safety of the detectives and the

> forensic services officers when they responded in – I wanted to
> make sure that they wouldn't be placed in any further danger.
> That's why I made another search of the house myself.

Ricardo explained he was looking for

> [a]nything that I would consider to be something that would place
> them in danger, any kind of – any kind of traps set up, booby trap,
> weapons, anything like that that would propose a danger, any other
> people in the house because we had went in fairly quickly, and I
> did not do another search of the upstairs.  I did not ask Officer
> Barger if they had been searching the upstairs once I walked out
> with [appellant].

Ricardo conducted a "visual search," opening only doors.

When Ricardo went upstairs, he returned to appellant's room.  Ricardo looked out the open window and noticed a pair of white tennis shoes "sitting outside the window on a planter box."  He walked over to the window and saw "red stains that appeared to me again to be blood spatter on the shoes themselves and on the laces."  He did not touch or seize the shoes at that time.

At some point that morning, officers at the scene contacted Detective Alfred Byrum, who remained at the police station, and requested that he prepare an affidavit for a search warrant.  After collecting information from several police officers, he prepared the affidavit.  Eventually, he took the affidavit to a magistrate and was granted a search warrant.

As the police at the scene were waiting for the search warrant to arrive, "it began to rain."  At first, Ricardo put "[t]hick, heavy craft paper" on the shoes to protect them from the rain.  Again, the officer did not touch the shoes.  As the rain continued and became heavier, the police concluded "the paper would not suffice for protecting the shoes from getting contaminated from rain.  We believed it would wash away and cause damage to the evidence."  Officer Stockman then collected the shoes from outside the window and retained them as evidence.

Once the search warrant arrived, the police collected several items from the house. A large flashlight was collected, as well as several knives from a sink in the kitchen.

Detective Christopher Molleen questioned appellant at the police station. Appellant initially claimed he came home after drinking two pitchers of beer at a bar and went to bed. He denied seeing Dietz that evening or early morning. He claimed he was not wearing his tennis shoes that night. Appellant suggested one of several women could have attacked Dietz, claiming he heard women's voices downstairs during the night. He then claimed he had blood on his body and clothing because he broke up a fight between O'Grady and Dietz. Appellant then changed his story again, admitting he had an altercation with the victim, but claiming it involved only a flashlight. Finally, appellant said that Dietz attacked him with a flashlight and a knife during an argument early that morning. He claimed he took the knife from Dietz and used it to defend himself, "poking" the knife at him at least once. Eventually he took the flashlight from Dietz. He told the detective he then hit Dietz once with the flashlight, very hard, in the head and then hit him again in the head as Dietz was falling to the floor. After the victim fell, he went upstairs to bed and did not leave the bedroom until the police arrived later that morning. Appellant insisted he was not drunk during this altercation.

Dr. Leah Bush, the medical examiner, testified that Dietz had sustained severe blunt force trauma and sharp force injury. She opined that Dietz received at least ten blows to the head and at least ten blows to his body and arms. She also explained that Dietz had numerous defensive wounds on his hands and arms. She concluded that Dietz had died as a result of severe blunt force trauma to the head, chest, and abdomen, with a stab wound to the abdomen contributing to his death.

Ruth Damaso of the Division of Forensic Science testified that DNA material from appellant's socks, sneakers, and hands was consistent with Dietz's DNA. The tests she ran excluded appellant as a source of this material.

Appellant testified in his own behalf at trial. He claimed he came home after a day of drinking and broke up a fight between O'Grady and Dietz. O'Grady then left. After making a telephone call and going upstairs, appellant returned downstairs. Appellant testified that Dietz, who was drunk, began verbally assaulting him and then "approached [him] yielding [sic] the flashlight and the knife." He said Dietz attacked him with the flashlight and a knife, telling appellant "[h]e was going to get me." Appellant testified, "I just kept telling him, don't do this." Appellant claimed he took two knives away from Dietz and then, while defending himself, hit Dietz twice with the flashlight. Appellant also claimed Dietz was sitting on the couch, mumbling and conscious, when he went upstairs to bed.

Appellant testified he was still feeling the effects of alcohol and the hit to his head when he was arrested that morning. He claimed he lied to Detective Molleen because he was confused and scared. He insisted his testimony was truthful.

At the suppression hearing, appellant argued the police illegally re-entered the residence after placing appellant in the police unit.[1] The trial court denied the motion to suppress.

In a post-verdict motion, appellant, for the first time, moved that the trial judge recuse herself, contending, as a juvenile and domestic relations district court judge, she heard a custody case involving appellant and his wife. Additionally, appellant reminded the judge that she had recused herself in a previous burglary case against appellant.

---

[1] Appellant also argued the search warrant was illegal, but that issue is not before this Court.

As to the custody case, the trial judge indicated:

> So I have no independent recollection of his custody case. I couldn't even tell you until you just said it that it was custody. I couldn't remember whether it was assault and battery, whether it was support, whether it was custody. Now that you've said it and I know the wife was here, I still don't know what the facts were; but I do know it was custody because you just told me that. That had nothing to do – I had no independent recollection of that. It would not be a reason for me to recuse myself.

The trial court explained she recused herself from the earlier burglary case because the victim "was a friend of the family" and "not because of anything about the defendant." She added, "It's a little late for a motion to recuse."

ANALYSIS

A. The Recovery of the Shoes

Appellant contends that, once he was arrested and placed in the police vehicle, the police violated his Fourth Amendment rights by re-entering the residence. He argues the police were required to wait for the search warrant to arrive.[2]

When addressing an allegation of error arising from a ruling on a motion to suppress, "we will review the evidence in the light most favorable to the Commonwealth, the party prevailing below, together with all reasonable inferences that may be drawn. The burden to establish that the denial of the motion to suppress constituted reversible error rests with the defendant." King v. Commonwealth, 39 Va. App. 306, 308, 572 S.E.2d 518, 519 (2002) (citations omitted).

> "We are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*) (citing Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1659, 134 L.Ed.2d 911 (1996)). However,

---

[2] Appellant does not contest the validity of the original entry, the original "sweep," or his seizure.

we review *de novo* the trial court's application of defined legal standards such as probable cause and reasonable suspicion to the particular facts of the case. See Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996); see also Ornelas, 517 U.S. at 699, 116 S. Ct. at 1659.

Hayes v. Commonwealth, 29 Va. App. 647, 652, 514 S.E.2d 357, 359 (1999).

> The Fourth Amendment to the Federal Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Therefore, warrantless searches are per se unreasonable, subject to a few specifically established and well-delineated exceptions, and the Commonwealth has the heavy burden of establishing an exception to the warrant requirement.

Megel v. Commonwealth, 262 Va. 531, 534, 551 S.E.2d 638, 640 (2001) (citations omitted).

During oral argument, the Commonwealth conceded Officer Ricardo's re-entry into the house was illegal. However, the Commonwealth contends the doctrine of inevitable discovery allows introduction of the evidence. The Commonwealth also argues, if the admission of the shoes into evidence was error, that error was harmless. We agree the inevitable discovery doctrine applies here.

> Inevitable discovery has long been recognized in Virginia as an exception to the exclusionary rule. Keeter [v. Commonwealth], 222 Va. [134,] 140 n.2, 278 S.E.2d [841,] 845 n.2 [(1981)]; Warlick[ v. Commonwealth], 215 Va. [263,] 265, 208 S.E.2d [746,] 748 [(1974)]. The United States Supreme Court approved this exception in Nix v. Williams, 467 U.S. 431 (1984). There, the Court held that evidence may be admitted under this theory if the prosecution can establish by a preponderance of the evidence that it would ultimately or inevitably have been discovered. Id. at 444.

Walls v. Commonwealth, 2 Va. App. 639, 655, 347 S.E.2d 175, 184 (1986). For this exception to apply, the Commonwealth must establish:

> "(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct, (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct, and (3) that the police also prior to the misconduct were actively pursuing the alternative line of investigation."

Id. at 656, 347 S.E.2d at 185 (quoting United States v. Cherry, 759 F.2d 1196, 1204 (5th Cir. 1985)); Wilkins v. Commonwealth, 37 Va. App. 465, 475, 559 S.E.2d 395, 400 (2002). The Commonwealth has met this burden.

O'Grady had informed the police that he had seen bloodstained shoes in the tub in the bathroom. Later, the shoes were in plain view outside the window, easily viewed from inside the bathroom. If the police had waited to re-enter the house when the search warrant arrived, then they would have discovered the shoes. The first prong of the exception is clearly met.

The leads that allowed the police to obtain a search warrant were within the knowledge of the officers prior to the illegal entry into the house. O'Grady had provided information, and the police had seen the murder victim in the house. Only after the police had this information did Officer Ricardo re-enter the house and discover the shoes. The second prong of the exception is established.

Finally, the police were in the process of obtaining a search warrant and had the information necessary to obtain the warrant when the illegal entry occurred. By the time Officer Ricardo re-entered the house, the police knew an argument had occurred between appellant and Dietz during the night. The police had legally entered the home and found Dietz's body, clearly the victim of a violent attack. O'Grady had informed them that appellant was in the house. All of this information was used to obtain the warrant. Officer Ricardo's actions did not prompt the police to request a search warrant; the shoes are not even mentioned in the affidavit. Detective Byrum, who prepared the affidavit and requested the warrant, never talked to Officer Ricardo. As the police were actively pursuing the option of a search warrant at the time Ricardo re-entered the house, the third prong of the inevitable discovery burden is met.

Although the officer did not have a search warrant at the time he entered and observed the shoes, we find the inevitable discovery doctrine allowed admission of the evidence at trial.

B.  The Recusal

Appellant contends the trial judge erred in failing to recuse herself from presiding over his murder trial.  He raises two bases for the recusal.  First, when she was a juvenile and domestic relations district court judge, the judge heard a custody case involving appellant.  Second, in an unrelated burglary trial involving appellant, the trial judge recused herself.

> We have consistently held that a trial judge must exercise reasonable discretion to determine whether he possesses such bias or prejudice as would deny a party a fair trial.  Justus v. Commonwealth, 222 Va. 667, 673, 283 S.E.2d 905, 908 (1981); accord, Slayton v. Commonwealth, 185 Va. 371, 376, 38 S.E.2d 485, 488 (1946).  "Merely because a trial judge is familiar with a party and his legal difficulties through prior judicial hearings . . . does not automatically or inferentially raise the issue of bias." Barry v. Sigler, 373 F.2d 835, 836 (8th Cir. 1967).

Deahl v. Winchester Dep't of Soc. Servs., 224 Va. 664, 672-73, 299 S.E.2d 863, 867 (1983).  "Decisions regarding a judge's impartiality are to be made by the judge in the exercise of his or her discretion and will be reversed on appeal only upon a finding that the court abused its discretion in deciding the question."  Scott v. Rutherfoord, 30 Va. App. 176, 189, 516 S.E.2d 225, 232 (1999).

The trial judge determined that she was able to preside impartially over appellant's trial.  As to the custody case, the trial judge stated she had no independent recollection of the matter.  The judge also indicated she recused herself from the burglary case because she knew the victim, "not because of anything about the defendant."  Appellant does not make a claim of bias beyond the judge's knowledge of these prior incidents.  Nothing in the record suggests the judge abused her discretion in denying the motion for recusal.  Although she may have been familiar with appellant's legal history, that fact alone does not necessitate recusal.

CONCLUSION

The trial court did not err in refusing to exclude the shoes as evidence.  Additionally, the judge did not err in presiding over the trial.  We affirm the first-degree murder conviction.

Affirmed.