# COURT OF APPEALS OF VIRGINIA

Present:    Judges Causey, Chaney and Callins
Argued by videoconference

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
v.        Record No. 0162-24-1        JUDGE DOMINIQUE A. CALLINS
JUNE 25, 2024

JOSEPH CORCORAN

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge

Justin M. Brewster, Assistant Attorney General (Jason S. Miyares,
Attorney General, on briefs), for appellant.

George Holton Yates (George Holton Yates, PC, on brief), for
appellee.

After police placed Joseph Corcoran in a van for transport to jail late one night in June

2019, a law enforcement officer searched his wallet. In it, the officer found a baggie containing

a crystal-like substance. Corcoran was subsequently charged with multiple counts, including

possession of a Schedule I or II controlled substance. Corcoran moved to suppress all evidence

resulting from his interaction with officers that night, and the circuit court granted Corcoran's

motion as to suppression of the wallet. The Commonwealth appeals, arguing that (i) the search

of the wallet was lawful, (ii) even if the search was unlawful, the evidence would have been

inevitably discovered, and (iii) the exclusionary rule does not apply. Because the

Commonwealth has failed to meet its burden in proving (i), (ii) or (iii), we affirm the judgment

of the circuit court.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND

At about 2:30 a.m. on June 29, 2019, Deputy Mark Simmons of the Virginia Beach Sheriff's Department was driving a police transport van near the oceanfront on Atlantic Avenue, when Aaron Underhill, a private citizen, flagged down Deputy Simmons near the Colony Condominiums. Underhill reported that he had heard a "commotion" while walking past the condominiums. Three "girls" had approached Underhill, asking for protection from Corcoran; the girls did not want Underhill to leave. Deputy Simmons requested backup assistance and related the information Underhill had given. While Deputy Simmons awaited other officers, Corcoran approached; he said he was the girls' father, he could discipline them as he pleased, and that the situation was no one else's business. Deputy Simmons described Corcoran as "aggressive, irritated, [and] angry."

As Sergeant Nicholas Ball and Officer Mitchell Mengel, who had arrived on the scene, interacted with Corcoran's wife and daughters, Corcoran entered his van, started it, remarked that the law enforcement officers did not have his permission to talk to his 15-year-old daughter, and told his wife and daughters to get in the vehicle. Corcoran's wife and daughters refused to get in the van, and Corcoran "tr[ied] to drive away." Deputy Simmons positioned himself in front of the van and told Corcoran to stop "several times"—"[e]ventually [Corcoran] stopped."[1]

---

[1] Before Sergeant Ball left to speak with Corcoran's wife, Corcoran told the sergeant that because his daughters had "disrespect[ed]" their mother, he was canceling their trip, and they were going home to Pennsylvania. Corcoran's speech was loud and slightly slurred, and Sergeant Ball detected a "minor" odor of alcohol. Corcoran's wife told Sergeant Ball that she believed he was having a "mental break" and was acting irrationally, telling Sergeant Ball that earlier Corcoran had tried to drive away in the vehicle when she was only partially inside it.

When Officer Mengel ordered Corcoran to exit the vehicle, Corcoran refused. Officer Mengel opened the van door and ordered Corcoran out, but Corcoran again refused.[2] After Officer Mengel reached into the vehicle to unlatch Corcoran's seatbelt, Corcoran pushed the officer away. Officer Mengel threatened to use his taser if Corcoran did not get out. A struggle followed that included Officer Mengel's use of both his taser and baton.

Officers eventually took Corcoran to the ground and handcuffed him. Afterwards, the law enforcement officers took Corcoran across the street to the location of Deputy Simmons's van, where they took Corcoran back to the ground to search him. The officers placed him in Deputy Simmons's van for transport to jail.

According to Officer Mengel, Corcoran was under arrest at that time. Officer Mengel testified that after an arrest, any personal property that was not illegal contraband, such as a wallet, would accompany a suspect to the jail, where an "intake" procedure would follow. Officer Mengel confirmed that, upon intake, such personal property, like a wallet, would be "searched."

Officer Rachel Nash testified that another officer "made it known to [her] that the wife was asking for the condo key, and [Nash] was told to look for it inside the actual wallet itself." Officer Nash acknowledged that after being told about the wife's request for the key, she went "into the wallet." In the wallet, "inside where the normal cash is," Officer Nash found a small bag of "crystal-like substance." Officer Nash could not recall whether she found the condo key

---

[2] Corcoran did not threaten the officers and gave no indication that he was armed. Officer Mengel did not say that Corcoran was being detained or was under arrest, nor did the officer explain why he wanted Corcoran to exit the vehicle. Moreover, Deputy Simmons testified that Corcoran, sitting in his van, was not breaking any laws "as far as [the officer] kn[e]w" and was not then under arrest.

in the wallet.[3] Moreover, although Officer Nash said that the wallet was found in Corcoran's pants pocket, she did not state explicitly whether she removed the wallet from his pocket, whether the wallet had been lawfully seized prior to her search, or how long after Corcoran had been placed in handcuffs her search of the wallet occurred.[4]

A grand jury in the City of Virginia Beach indicted Corcoran for possessing a Schedule I or II controlled substance and two counts of assault or assault and battery upon a law enforcement officer. Corcoran was also charged by warrant with misdemeanor obstruction of justice.

In a written motion to suppress, Corcoran asserted that the police searched the wallet without his consent, before he was formally arrested for any crime, and during a seizure "in the absence of probable cause or reasonable suspicion[.]" He asserted that the police violated his

---

[3] When cross-examining Officer Nash, Corcoran also asked, "But you don't know if *he* found it or not?" Officer Nash responded, "I don't recall." Based on the exchange, it is not clear to whom the "he" in Corcoran's question referred.

[4] Officer Nash's testimony regarding the location of the wallet at the time that she searched it was limited to the following exchange:

> Commonwealth: Were you—did it become known to you that someone was asking to get something out of the defendant's wallet?
>
> Officer Nash: Correct.
>
> Commonwealth: Can you describe to us what was that about?
>
> Officer Nash: Another officer made it known to me that the wife was asking for the condo key, and I was told to look for it inside the actual wallet itself.
>
> Commonwealth: Okay. And do you know where the wallet had been found?
>
> Officer Nash: In one of his pants pockets for the male that was in custody.

constitutional rights by using excessive force "at a time that he was not under arrest or even under reasonable suspicion of any crime." He maintained that the circuit court should, as a result, "suppress and exclude from the trial . . . any and all evidence derived from the unlawful and unconstitutional acts" as well as dismiss the charges against him.

After hearing testimony and argument related to Corcoran's motion, the circuit court questioned the admissibility of the evidence found in the wallet because the Commonwealth had not introduced testimony related to how precisely the wallet came into police possession when Officer Nash searched it. The circuit court explained,

> I don't know where the wallet was when Officer Nash searched it.
> I don't know if it was still in his pocket, it had been taken out and
> put in some kind of container. There's a lot of holes in this case,
> and I'm going to sustain the defendant's motion to suppress the
> search of the wallet.

Although it granted Corcoran's motion to suppress the evidence seized from the wallet, the circuit court refused Corcoran's request to dismiss "the rest of the charges." The Commonwealth appeals the circuit court's ruling under Code § 19.2-398(A)(2).

ANALYSIS

I. Standard of Review

"The Fourth Amendment protects individuals from unreasonable searches and seizures." *Parady v. Commonwealth*, 78 Va. App. 18, 28 (2023). "[W]arrantless searches are *per se* unreasonable, subject to a few specifically established and well-delineated exceptions." *Id.* at 28-29 (alteration in original) (quoting *Megel v. Commonwealth*, 262 Va. 531, 534 (2001)). "The Commonwealth bears the burden of proving that a warrantless search fits under an exception to the warrant requirement of the Fourth Amendment." *Id.* at 24. "[W]e 'review[] *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment.'" *Id.* at 29 (second alteration in original) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 475 (2020)).

- 5 -

Further, "[i]n an appeal by the Commonwealth of an order of the trial court suppressing evidence, the evidence must be viewed in the light most favorable to the defendant and findings of fact are entitled to a presumption of correctness unless they are plainly wrong or without evidence to support them." *Commonwealth v. Peterson*, 15 Va. App. 486, 487 (1992).

## II. The Search-Incident-to-Arrest Doctrine

The Commonwealth's first argument reduces to the simple claim that, because Corcoran had been lawfully arrested, and the search of Corcoran's wallet was contemporaneous with that arrest, "Officer Nash was permitted to search the wallet as a search incident to arrest."

"Under the Fourth Amendment, '[w]hen officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest, and to search the suspect in order to safeguard evidence and ensure their own safety.'" *Joyce v. Commonwealth*, 56 Va. App. 646, 657 (2010) (alteration in original) (quoting *Virginia v. Moore*, 553 U.S. 164, 178 (2008)). It follows that "the search incident to arrest 'exception' is really a subset of the 'exigent circumstances' doctrine; one of the 'particular types of exigencies—circumstances that present a compelling need for immediate action—which occur often enough that the courts treat them as separate exceptions to the Warrant Clause.'" *Parady*, 78 Va. App. at 31-32 (quoting Ronald J. Bacigal & Corinna Barrett Lain, *Warrantless Searches—Exigent Circumstances*, Va. Prac. Crim. Pro. § 4:24 (2022-2023 ed.)).

Thus, "[a]n officer may search after—or even before—an arrest so long as the search 'is substantially contemporaneous with the arrest and confined to the immediate vicinity of the arrest.'" *Id.* at 32 (quoting *Stoner v. California*, 376 U.S. 483, 486 (1964)). "This well-established exception to the warrant requirement has long been understood as promoting officer safety and evidence preservation." *Id.* That is, "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the

latter might seek to use in order to resist arrest or effect his escape." *Id.* (quoting *Chimel v. California*, 395 U.S. 752, 762-63 (1969)). "Likewise, it is 'entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.'" *Id.* (quoting *Chimel*, 395 U.S. at 763). "But these justifications are absent where a search is remote in time or place from the arrest." *Kirby v. Commonwealth*, 209 Va. 806, 809 (1969) (quoting *Preston v. United States*, 376 U.S. 364, 367 (1964)).

We have previously stated that "[i]t matters not that the search preceded the actual arrest so long as probable cause existed at the time of the search." *Slayton v. Commonwealth*, 41 Va. App. 101, 108 (2003). This is because "[o]nce 'probable cause exists to arrest a person, a constitutionally permissible search of the person incident to arrest may be conducted by an officer either before or after the arrest if the search is contemporaneous with the arrest.'" *Id.* (emphasis omitted) (quoting *Italiano v. Commonwealth*, 214 Va. 334, 336 (1973)). Put differently, "when 'the formal arrest follow[s] quickly on the heels of the challenged search,' it is not 'particularly important that the search preceded the arrest rather than vice versa,' 'so long as probable cause existed at the time of the search.'" *Joyce*, 56 Va. App. at 657 (first quoting *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); and then quoting *Slayton*, 41 Va. App. at 108).

Even so, "[t]here is no 'bright line' rule on how many minutes may pass between search and arrest for the arrest to still be 'contemporaneous,'" under the search-incident-to-arrest doctrine. *Parady*, 78 Va. App. at 33. However, as we observed in *Parady*, "courts have found that a search may be incident to an arrest . . . where the search and arrest were separated by times ranging from five to sixty minutes." *Id.* (quoting *United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006)). *See also Kirby*, 209 Va. at 809-10 (determining that a search that occurred "[a]fter the arrest of defendant had been made, and the parties dispatched to jail in a patrol wagon," "was not remote in time or place from the arrest").

We assume, *arguendo*, that Corcoran was arrested upon application of physical force.[5] Nevertheless, applying the search-incident-to-arrest doctrine requires certain evidentiary predicates beyond simply an arrest that are absent from this record. Most relevant, the record is silent as to when, precisely, Officer Nash's search of the wallet occurred.[6]

Deputy Simmons recalled that, after "rescue took off, . . . word came by that the wife . . . and the kids were locked out of the hotel because . . . Corcoran had the key. So I don't know who actually, but someone went through the wallet." Thus, while it may be concluded that Officer Nash's search took place after rescue had departed from the scene, the record is without any indicia as to when, exactly, in time this would have been.[7] And while the departure of "rescue" serves as a temporal marker, providing some point of reference regarding the sequence

---

[5] Following a struggle, officers got Corcoran onto the ground and placed handcuffs on him. An arrest requires either an "application of physical force or, where that was absent, submission to the assertion of authority." *Carvel v. Commonwealth*, 28 Va. App. 484, 486 (1998) (en banc); *see California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority.").

[6] The Commonwealth contends that "Officer Nash searched a wallet" that had been "previously seized by a fellow officer during a search incident to arrest." A search immediately following Corcoran's arrest—which preceded Officer Nash's search of the wallet—would have been lawful, as the record shows such search would have been "substantially contemporaneous" with Corcoran's arrest. *Parady*, 78 Va. App. at 32 (quoting *Stoner*, 376 U.S. at 486). Under such circumstances, whether Officer Nash later searched the wallet would be of no moment, since an "arrestee has no reasonable expectation of privacy" in "property [that] has been lawfully seized by law enforcement personnel pursuant to that arrest." *Williams v. Commonwealth*, 259 Va. 377, 386 (2000). But the record provides no support for conclusion that the wallet had been seized in a search. Instead, Deputy Simmons testified that "I don't know who actually, but someone went through the wallet." While Officer Nash testified that the wallet was "[i]n one of his pants pockets for the male that was in custody," her testimony, read in the light most favorable to Corcoran, supplies no foothold for the Commonwealth's inference that the wallet had been seized in the search incident to arrest that took place before Officer Nash's search of the wallet. In the absence of such evidence, we must determine whether Officer Nash's search of the wallet falls within the parameters of a search incident to arrest.

[7] At oral argument, the Commonwealth observed "as to the timeline" that "Deputy Simmons testified that he was working on the oceanfront beginning at 2:30 a.m. that night" and that "the warrant was issued at 5:13 a.m." The Commonwealth concluded that "we're looking at all of this having occurred within a fairly short period of time."

of events, it is not evident how long after that departure Officer Nash's search took place. Nor may we infer, in the absence of evidence, that the search was "substantially contemporaneous" with the arrest. *Parady*, 78 Va. App. at 32 (quoting *Stoner*, 376 U.S. at 486); *see id.* at 29 ("[T]he Commonwealth ha[s] the burden of proving the legitimacy of [the] warrantless search and seizure." (second alteration in original) (quoting *Reittinger v. Commonwealth*, 260 Va. 232, 235-36 (2000))).

Accordingly, the meaningful gaps in the record before us preclude application of the search-incident-to-arrest doctrine.[8] Specifically, we cannot say that Officer Nash's search was substantially contemporaneous with Corcoran's arrest since the record fails to disclose the precise relation in time of those two points.

### III. The Inevitable Discovery Doctrine

The lack of information about where Corcoran's wallet was before Officer Nash's search precludes application of the inevitable discovery doctrine.

While "[o]rdinarily, evidence obtained as the result of an unlawful search is subject to suppression under the exclusionary rule," "[o]ne of the exceptions to the exclusionary rule is the doctrine of inevitable discovery." *Commonwealth v. Jones*, 267 Va. 532, 535 (2004). "The inevitable discovery doctrine is an 'off-shoot of the independent source doctrine,' and is . . . intended to put police in the same position they would have been without the error or misconduct." *Carlson v. Commonwealth*, 69 Va. App. 749, 763 (2019) (quoting *Wilkins v.*

---

[8] After the circuit court delivered its ruling, the Commonwealth seemed to acknowledge this deficiency, remarking, "so the defendant's motion [to suppress] . . . doesn't actually talk about him trying to get the suppression of the wallet . . . which is why we didn't put on the evidence—more evidence as to the search of the wallet." In response, the circuit court noted that Corcoran's motion to suppress explicitly asserted, "[t]he officers . . . without the consent of the defendant, searched his wallet and opened it to obtain the requested room key. During the search, officers allegedly located a baggie." The court construed Corcoran to be challenging the search of the wallet and advised the parties that it based its ruling accordingly.

*Commonwealth*, 37 Va. App. 465, 475 (2002)).  "To establish" that the "'evidence obtained by unlawful means'" would have "'ultimately or inevitably . . . been discovered by lawful means,'" "the Commonwealth must show '(1) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct' and '(2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct.'" *Id.* (quoting *Jones*, 267 Va. at 536).

"Moreover, 'inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings.'" *Knight v. Commonwealth*, 71 Va. App. 771, 788 (2020) (quoting *Carlson*, 69 Va. App. at 765).  "As a result, the inevitable discovery rule is most likely to be applied 'if [alternative] investigative procedures were already in progress prior to the discovery via illegal means, . . . or where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later.'" *Id.* (quoting 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(a), at 363-64 (5th ed. 2012)).

Here, the crux of the Commonwealth's argument is that once Corcoran was transported to the jail, the regular application of jail intake procedures would have acted as an evidence-revealing event.  Those procedures would have subjected Corcoran's wallet to search, and thereby, resulted in the discovery of the baggie concealed within it.

We disagree.  Assuming that Officer Nash's search was unlawful, and the intake process would have proceeded as the Commonwealth contends,[9] it is unclear that such process would have

---

[9] Officer Mengel testified that, when placed under arrest and taken to jail, a person goes through an "intake process."  The below exchange between Officer Mengel and the Commonwealth followed, with Officer Mengel averring that, following arrest, an individual is

operated as an evidence-revealing event, since, as the circuit court found, the record is unclear as to where Corcoran's wallet would have been had Officer Nash's search not occurred.

Indeed, after hearing testimony and argument, the circuit court found that it did not "know where the wallet was when Officer Nash searched it," and noting that it could not determine whether "it was still in his pocket, [or] it had been taken out and put in some kind of container," concluded that "[t]here's a lot of holes in this case."

At the suppression hearing, evidence of the status of the wallet at the time Officer Nash's search was confined to single ambiguous exchange. That exchange comprised a single question and response, and proceeded as follows:

> Commonwealth: Okay. And do you know where the wallet had
> been found?

---

taken to jail, where normal, non-illegal property in the individual's possession would be "searched."

> Commonwealth: And is any personal property ever taken with
> them?
>
> Officer Mengel: Yes. Any personal property that they have on
> them, it goes with them, yes, to the jail.
>
> Commonwealth: And would be searched at the jail?
>
> Officer Mengel: Set aside from—yes. So normal property that is
> not—you know, that's not illegal to possess would go with them.
> Any other items located would not go with them. There's a
> separate protocol for that.
>
> Commonwealth: Such as a wallet?
>
> Officer Mengel: A wallet—
>
> Commonwealth: A wallet would go—
>
> Officer Mengel: —would go.
>
> Commonwealth: —with him?
>
> Officer Mengel: Yes.

- 11 -

Officer Nash: In one of his pants pockets for the male that was in custody.

A rational factfinder can glean two inferences from the exchange. First, it is clear that the wallet Officer Nash searched was, at some point, discovered on Corcoran's person. Second, the leading question posed by the Commonwealth ("And do you know where the wallet *had been* found?"), when coupled with Officer Nash's response, suggests that the wallet was found by the time that Officer Nash opened and searched it. *See Past Perfect, Webster's Third New International Dictionary Unabridged* ("[O]f, relating to, or constituting a verb tense that is traditionally formed in English with *had* and denotes an action or state as completed at or before the past time spoken of."). But the exchange fails to establish precisely when or where the wallet had been found when Officer Nash searched.

Here, the doctrine of inevitable discovery applies if there exists a reasonable probability that the wallet would have been discovered through the routine application of jail intake procedures. *See Knight*, 71 Va. App. at 788 (explaining that "inevitable discovery involves no speculative elements but *focuses on demonstrated historical facts capable of ready verification*" (emphasis added) (quoting *Carlson*, 69 Va. App. at 765)). In the light most favorable to Corcoran, there remains an evidentiary gap which makes impossible the task of pinpointing that probability. Because we cannot "know where the wallet was when Officer Nash searched it," we do not know whether the wallet would have been in Corcoran's possession when he traveled to the jail. If the wallet was *not* in Corcoran's possession, any search upon intake into the jail would have failed to reveal the evidence. *Cf. Jones*, 267 Va. at 536 (observing that "evidence obtained by unlawful means is . . . admissible 'if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means'" (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984))). Thus, because the evidence—and the lack thereof—supports the circuit court's conclusion that we cannot "know where the wallet was when Officer Nash

searched it," we are bound by this finding on appellate review. *See, e.g.*, *Kuhne v. Commonwealth*, 61 Va. App. 79, 86 (2012) ("The reviewing court is bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them, and 'must give deference to the inferences that may be drawn from those factual findings.'" (quoting *Commonwealth v. Hilliard*, 270 Va. 42, 49-50 (2005))).

## IV. The Exclusionary Rule

The Commonwealth further argues that if this Court finds that Officer Nash's search was unlawful and that the inevitable discovery doctrine does not apply, the circuit court *still* erred because the circumstances here do not require application of the exclusionary rule. Specifically, the Commonwealth contends that the exclusionary rule does not apply because Officer Nash's search was "reasonable" and undertaken in "good faith." After all, the Commonwealth asserts, Officer Nash's options were limited to "search[ing] Corcoran's wallet to retrieve the key his wife indicated would be there or . . . leav[ing] Corcoran's wife and daughters outside until the wallet could be inventoried and searched at the jail hours later." At most, the Commonwealth contends, Officer Nash's "transgress[ion] [of] the Fourth Amendment," if there was one, "was minor."

As we recently explained in *Parady*, "[i]n assessing whether an officer's conduct was sufficiently deliberate [as for the exclusionary rule to apply], our Supreme Court has looked to two considerations: 'What was the state of the law governing [the officer's] search at the time that [s]he conducted it, and what factual circumstances provided either clarity or ambiguity to [the officer] in h[er] presumed reliance upon that law?'" 78 Va. App. at 38 (third and fifth alterations in original) (quoting *Collins v. Commonwealth*, 297 Va. 207, 219 (2019)). "In examining 'the state of the law at the time of the search,' we ask whether a 'reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Id.* (quoting *Collins*, 297 Va. at 219-20). "Our analysis is 'focused on the

"flagrancy of the police misconduct at issue,'" and we 'employ the "last resort" remedy of exclusion only when necessary "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."'" *Id.* (quoting *Collins*, 297 Va. at 219). That is, "[e]xclusion of evidence is a last resort rather than the first impulse." *Carlson*, 69 Va. App. at 759.

Here, the Commonwealth marshals no arguments regarding the state of the law at the time that Officer Nash conducted her search.[10] Nor does the Commonwealth adduce evidence showing whether "a 'reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Parady*, 78 Va. App. at 38 (quoting *Collins*, 297 Va. at 219-20). Instead, relying on *United States v. Leon*, 468 U.S. 897 (1984), the Commonwealth contends that Officer Nash's search was undertaken "in good faith," and represented, at most, a "minor" transgression of the Fourth Amendment.

The Commonwealth misplaces its reliance on the *Leon* "good faith" exception to the exclusionary rule. As our Supreme Court explained regarding *Leon*, "the Supreme Court of the United States limited the application of the exclusionary rule 'so as not to bar the admission of evidence seized in reasonable, good-faith reliance *on a search warrant* that is subsequently held to be defective." *Adams v. Commonwealth*, 275 Va. 260, 268 (2008) (emphasis added) (quoting *Leon*, 468 U.S. at 905). Thus, *Leon* involved the application of the good-faith exception to reliance on an ultimately defective warrant. *See Leon*, 468 U.S. at 920 (instructing that the exclusion of evidence would "'not further the ends of the exclusionary rule'" where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and

_____

[10] Instead, the Commonwealth simply, and incorrectly, claims, "Here, Officer Nash searched a wallet previously seized by a fellow officer during a search incident to arrest."

- 14 -

acted within its scope" (quoting *Stone v. Powell*, 428 U.S. 465, 539 (1976) (White, J.,

dissenting))). Conversely, this case centers on the lawfulness of an officer's *warrantless* search.

Nevertheless, the good-faith exception has been applied in contexts beyond defective

warrants, including to searches carried out in reasonable reliance on statutes that were later

invalidated, *Illinois v. Krull*, 480 U.S. 340 (1987), "clerical errors of court employees," *Arizona

v. Evans*, 514 U.S. 1, 16 (1995), and erroneous information in a warrant database maintained by

police employees, *Herring v. United States*, 555 U.S. 135, 137-38, 142-47 (2009). Further, the

good-faith exception has been applied where an officer, in executing a warrantless search of a

vehicle incident to arrest, reasonably relied on judicial precedent that was later narrowed. *Davis

v. United States*, 564 U.S. 229, 235-40 (2011).

But none of the situations described in which the good-faith exception was applied reflect

the circumstances here. And the Commonwealth points to no authority establishing that the

good-faith exception could apply to a search that is neither incident to nor contemporaneous with

the arrest. While it may be true that Officer Nash aspired to render helpful assistance to the

family in retrieving the condo key, the Commonwealth's failure to show that her warrantless

search falls within one of the narrow categories of warrantless-search circumstances to which the

good-faith exception to the exclusionary rule applies forecloses its application here.

Accordingly, the Commonwealth has failed to meet its burden in showing that the

exclusionary rule does not apply.[11] And we will not reverse the circuit court's judgment in the

---

[11] In addition, the Commonwealth makes the bare assertion that Officer Nash's "transgression," to the extent that there was one, "was minor." In so asserting, the Commonwealth seems to invite this Court to fill out and construct its argument. We decline this invitation, and the argument is waived under 5A:20(e). *See Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) ("Rule 5A:20(e) requires that an appellant's opening brief contain '[t]he principles of law, the argument, and the authorities relating to each question presented.' Unsupported assertions of error 'do not merit appellate consideration.'" (alteration in original) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008))); *id.* at 746 ("Simply put, '[i]t is

- 15 -

absence of a showing that reversible error occurred.  *See Commonwealth v. Benjamin*, 28

Va. App. 548, 552 (1998) ("The burden is on the appellant to show that the trial court's decision

constituted reversable error." (quoting *Quinn v. Commonwealth*, 25 Va. App. 702, 712 (1997))).

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court and remand for

further proceedings consistent with this opinion.

*Affirmed.*

---

not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.'" (quoting *Sneed v. Bd. of Prof'l Responsibility of the Supreme Court of Tenn.*, 301 S.W.3d 603, 615 (Tenn. 2010))).